IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>LAURA ANNE GALLAGHER and<br>ANDREY NIKOLAYEVICH KALUGIN,<br><br>*Defendants.* | **Filed Under Seal**<br><br>Case No. 1:20-MJ- 343<br>         1:20-MJ- 344 |

**AFFIDAVIT IN SUPPORT OF**
**A CRIMINAL COMPLAINT AND ARREST WARRANT**

I, Special Agent Gregory E. Newman, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I am a Special Agent with the Diplomatic Security Service (DSS), United States Department of State (DOS), and have been since June 2014. In that capacity, I primarily investigate violations of federal statutes concerning human trafficking and frauds related to visas and passports. I am presently assigned to DSS' Criminal Fraud Investigations Unit. As a federal agent, I am authorized to investigate violations of laws of the United States, and as a law enforcement officer I am authorized to execute warrants issued under the authority of the United States.

2. Prior to joining DSS, I served with the Metropolitan Police Department in Washington, D.C. for two years and conducted research for the Police Executive Research Forum. I have received specialized training in law enforcement and criminal law from both the Federal Law Enforcement Training Center in Glynco, Georgia and the Metropolitan Police

Academy in Washington, D.C.  I have conducted numerous investigations into various types of criminal violations, including travel document and immigration frauds, financial frauds, assaults and bodily injuries, property crimes, firearms offenses, and narcotics offenses.

3. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. §§ 1425 and 2, naturalization fraud and aiding and abetting, have been committed by LAURA ANNE GALLAGHER ("GALLAGHER") and ANDREY NIKOLAYEVICH KALUGIN ("KALUGIN").

4. The facts in this affidavit come from my personal observations, interviews with witnesses, my training and experience, information obtained from other agents and witnesses, subpoenaed records, and materials obtained by search warrant.  As part of this investigation, I also reviewed GALLAGHER's U.S. government work email account. This account, which is assigned to and exclusively used by GALLAGHER, is part of an unclassified network account protected by a unique username and password.  When logging into these government accounts, users are warned that they are "accessing a U.S. government information system" and requires that all users agree to the following:

> [B]y using this information system, you understand and consent to the following you have no reasonable expectation of privacy regarding any communications or data transiting or stored on this information system. At any time, and for any lawful government purpose, the government may monitor, intercept, and search and seize any communications or data transiting or stored on this information system.

5. In addition, I executed a search warrant on GALLAGHER's Facebook account and on one of GALLAGHER's known Google email accounts (known as "Gmail"), both issued by the Honorable Judge Ivan D. Davis in the Eastern District of Virginia on July 1, 2019.  The results from the warrant were first reviewed and separated by a filter team.

2

6. This affidavit is intended to show merely that there is sufficient probable cause for the requested criminal complaint and warrant and does not set forth all my knowledge about this matter.

## BACKGROUND

A. Overview of the Process to Obtain Lawful Permanent Residence and Citizenship through Naturalization

7. Naturalization is the process by which a foreign citizen or national can become a United States citizen. In order to naturalize, an applicant must be qualified to apply for citizenship. In general, an applicant for naturalization must establish, among other things, that he or she has been lawfully admitted to the United States for permanent residence at the time of filing the naturalization application. One of the ways a Lawful Permanent Resident, also known as an "LPR" or "green card holder," obtains his or her legal status is through a family-based petition, such as when a U.S. Citizen or LPR petitions for his or her foreign national (or "alien") spouse. The U.S. Citizen or LPR Petitioner must file a Form I-130 Petition for Alien Relative to establish his or her relationship to a qualifying alien relative. The Petitioner and alien relative generally must submit to U.S. Citizenship and Immigration Services (USCIS) the application and evidence of their relationship. USCIS is the agency within the Department of Homeland Security delegated to administer lawful permanent residence, citizenship and naturalization law and policy by adjudicating applications in a consistent and accurate manner. The alien relative will also need to submit a Form I-485 Application to Register Permanent Residence or Adjust Status. Once both the Form I-130 and the Form I-485 are approved and there is an immigrant visa available within the applied-for category, the alien relative obtains his or her lawful status.

8. Typically, a foreign national must establish five years of continuous residence and physical presence within the United States before applying for U.S. citizenship through

3

naturalization. However, if an alien has adjusted his or her status through a family-based petition based on a bona fide marriage to a U.S. citizen, he or she need only wait three years before applying for naturalization.

9. Generally, an applicant for naturalization must, among other things, honestly complete and file with USCIS a Form N-400, Application for Naturalization ("Form N-400"). An assigned USCIS Immigration Officer (IO) will review all submitted paperwork in the foreign national's immigration file ("A-file"), conduct an interview with the foreign national on his or her Form N-400, subject the foreign national to tests that demonstrate his or her proficiency in English and American history, among other reviews.

10. If the N-400 is approved, the applicant subsequently fills out a pre-oath ceremony notice and questionnaire, Form N-445 Notice of Naturalization Oath Ceremony ("Form N-445"), which the applicant fills out to indicate any changes in certain answers from the time they were interviewed to the date of the oath ceremony. If the applicant remains eligible, the oath of citizenship is administered and USCIS issues the applicant a Certificate of Naturalization.

B. Expeditious Naturalization under Section 319(b) of the Immigration and Nationality Act

11. The spouse of a U.S. citizen who is "regularly stationed abroad" in qualifying employment may be immediately eligible for naturalization on the basis of their marriage. *See* 8 C.F.R. § 319.2. This provision of the law, known as "319(b) naturalization" or "expeditious naturalization," is a mechanism by which LPR spouses of U.S. government employees and of those in other qualifying positions are exempt from the three- or five-year continuous residence and physical presence requirements for naturalization. *See* 8 C.F.R. § 319.2(a)(6). Among other requirements, LPRs being naturalized under section 319(b) must swear under perjury in a formal sworn statement, collected as part of their naturalization interview, his or her good faith intent to

reside abroad with the U.S. citizen spouse, and his or her intent to take up residence within the U.S. immediately upon the termination of such employment abroad of the citizen spouse. *See* 8 C.F.R. § 319.2(a)(4). Further, regulations require that LPRs seeking expeditious naturalization under section 319(b) declare in good faith an intention that he or she will leave the United States to live with his or her spouse abroad within 30 to 45 days after the date of naturalization. *See* 8 C.F.R. § 319.2(b). Expeditious naturalization under section 319(b) often results in LPRs becoming U.S. citizens years faster than those applying for naturalization under regular procedures.

## **PROBABLE CAUSE**

A. Timeline of Events with KALUGIN's Immigration History

12. Since in and around February 2019, DSS has been investigating 319(b) naturalization fraud by GALLGAHER and KALUGIN.

13. GALLAGHER, who is a United States citizen, is employed as a Foreign Service Officer (FSO) with the DOS and holds a U.S. top secret security clearance. GALLAGHER is currently a United States diplomat accredited as a Second Vice Consul at the United States Embassy in Rome, Italy and assigned in a consular role. Previously, GALLAGHER served as a U.S. diplomat as a Vice Consul at the U.S. Consulate in Matamoros, Mexico. In her diplomatic consular roles, GALLAGHER is not employed as an attorney but is responsible for reviewing and adjudicating visas, as well as other immigration and naturalization documents and matters, for the United States Government. GALLAGHER graduated with a Juris Doctor from University of California, Davis School of Law (UC-Davis) in May 2015, and maintains active bar status in California, though a bar license is not needed to perform FSO duties.

5

14. KALUGIN is a national of Russia who entered the United States in and around 2011 on a non-immigrant tourist visa and subsequently changed his status to a non-immigrant student visa, commonly known as an F-1 visa. KALUGIN has a Russian *juris doctorate*-equivalent degree and had worked as an attorney while in Russia. While in the United States, KALUGIN enrolled in a community college and English language educational programs before enrolling in the LL.M program at UC-Davis's School of Law where he met GALLAGHER. GALLAGHER and KALUGIN began a relationship in and around January 2014.

15. GALLAGHER emailed with KALUGIN to discuss ways in which he could secure an immigrant visa. First, in and around September 2014, she assisted KALUGIN with filing for another temporary immigration benefit through USCIS, which was ultimately unsuccessful. Second, GALLAGHER described a process through which KALUGIN's work-study attorney could sponsor him for a temporary skilled worker visa under the H-1B visa classification. On or about November 16, 2014, GALLAGHER emailed KALUGIN and explained that his student visa would likely expire before an H-1B visa would be approved, that H-1B visas were capped in number, and that they were challenging to get. GALLAGHER instead suggested that "it may be time to think about alternative plans."

16. GALLAGHER and KALUGIN then married in a civil ceremony in Ventura, California, on or about June 4, 2015, approximately six weeks before the scheduled expiration of his student visa on July 15, 2015.

17. On or about June 30, 2015, GALLAGHER signed and subsequently submitted to USCIS a Form I-130 Petition for Alien Relative, based on her purported marital relationship with KALUGIN. On or about that same day, KALUGIN caused to be submitted to USCIS a Form I-485, Application to Register Permanent Residence or Adjust Status based on his marriage to

GALLAGHER.  Both forms require applicants to certify under penalty of perjury that all the contents of the application are true and correct.  GALLAGHER also signed and caused to be submitted to USCIS a Form G-28, Notice or Entry of Appearance as Attorney, which entered GALLAGHER as KALUGIN's legal representation for his Form I-485 adjudication.  USCIS received both the Form I-130 and Form I-485 on or about October 13, 2015.

18. On or about July 22, 2016, KALUGIN completed his Form I-485 interview with the USCIS Office in Fairfax, Virginia, and USCIS approved his application that same day.

19. On or about August 30, 2016, KALUGIN signed a Form N-400 citing 319(b) naturalization eligibility.  As discussed further below, KALUGIN made material misrepresentations on this form.  USCIS received the application on or about September 8, 2016.  GALLAGHER submitted to USCIS a Form G-28 on or about January 27, 2017 to note her entry of appearance as KALUGIN's attorney for the Form N-400.

20. On February 5, 2018, KALUGIN appeared at the USCIS Office in Fairfax, Virginia, located in the jurisdiction of the Eastern District of Virginia for his naturalization interview.  GALLAGHER was not present, and KALUGIN signed a written waiver of her presence during the interview.  KALUGIN was also required to submit to USCIS a sworn statement as to his intention to join GALLAGHER at her post abroad within a required time period after naturalizing.  As discussed further below, KALUGIN made material misrepresentations during the interview and in the supporting sworn statement.

B. GALLAGHER and KALUGIN's Separation During the Immigration Process

21. GALLAGHER hid her marriage from her family with whom she communicated often and who believed that she and KALUGIN were only dating and not yet married.  For example, GALLAGHER emailed a family member on September 14, 2015, and specifically

7

identified KALUGIN as her "boyfriend," even though they had married three months earlier. Evidence further shows that GALLAGHER and KALUGIN staged a wedding proposal in and around Thanksgiving 2015 during which GALLAGHER proposed to KALUGIN, despite already being legally married and having applied for immigration benefits for KALUGIN approximately five months earlier.

22. GALLAGHER and KALUGIN maintained this lie throughout the duration of their relationship. For example, in a January 21, 2016 email to recipients that included family members, GALLAGHER announced her employment with the Department of State and added that she was not yet married but had plans for a future wedding; she further mentioned the ability to naturalize KALUGIN expeditiously through her employment as a diplomat. I know based on my training and experience, that people who marry for the purposes of immigration fraud often conceal their marriage from family and friends to avoid scrutiny from those close to them.

23. In and around the beginning of March 2016, GALLAGHER and KALUGIN arrived in Arlington, Virginia, which coincided with GALLAGHER's initial FSO training known as "A-100," a required multi-month orientation course that all foreign service officers must attend when hired. On or about March 10, 2016, KALUGIN updated USCIS with his new address at their department-funded housing at a luxury apartment building in Arlington, Virginia.

24. However, the investigation revealed that shortly after moving to Virginia, in and around May 2016, GALLAGHER and KALUGIN separated.

**State Records**

25. Records show that on or about May 31, 2016, KALUGIN obtained a new California driver's license with his true address in Sacramento, California.

8

26.     Further, in a court document signed on or about July 10, 2018 and subsequently with the Superior Court of California, County of Sacramento, GALLAGHER petitioned for the dissolution of marriage to KALUGIN.  In the filing, she listed the date of separation as "01-May-2016" and indicated that the "time from date of marriage to date of separation" is "0 Years" and "11 Months."  GALLAGHER affirmed these sworn statements under penalty of perjury, establishing that she represented to the Superior Court of California that she had been separated from KALUGIN almost two years before he naturalized as a United States citizen though the 319(b) naturalization mechanism.

*Facebook records*

27.     A review of Facebook records obtained by search warrant further establish that GALLAGHER and KALUGIN had separated in and around May 2016.  During that time period, GALLAGHER and KALUGIN used Facebook Messenger to chat as he drove from Arlington, Virginia back to Sacramento, California.  Several messages from KALUGIN to GALLAGHER indicate that between May 19 and 22, 2016, he traveled through Wisconsin, Wyoming, Idaho, and Tahoe (which borders California and Nevada).  GALLAGHER also used a Facebook function through which to send money to KALUGIN for food, gas, and hotel stays during his drive.

28.     While GALLAGHER and KALUGIN were sending messages of affection to each other during his travels back to California, by on or about September 18, 2016, GALLAGHER had messaged a Facebook user with initials J.J. that she had "split up" from KALUGIN because "[h]e wants to stay in California for [the] rest of [his] life."

9

29.     Additionally, on or about October 24, 2017, GALLAGHER sent a message to KALUGIN and asked if he could send her his address, implying that they were no longer living together.

*Bank records*

30.     The timeline of GALLAGHER and KALUGIN's separation in and around May 2016 comports with records from KALUGIN's bank account.  Bank records dating from in and around April 2014 show that KALUGUN used his bank card on a frequent and constant basis in California until he briefly moved with GALLAGHER to Arlington, Virginia in and around March 2016, when he continued the use of his bank card in the D.C. area.  However, on or about May 18, 2016, KALUGIN used his card to purchase gas in Mantua, Ohio.  Bank records then show KALUGIN purchasing gas, food, and hotel reservations in locations across Indiana, Wisconsin, Minnesota, North Dakota, Montana, Wyoming, Idaho, Nevada, before arriving in Sacramento, California on May 23, 2016, where he made a purchase at a Sacramento Walmart.

31.     KALUGIN's bank records show his consistent presence in California from in and around late-May 2016 through at least August or September 2018 with the exception of two time periods: in and around July 22, 2016, when purchases were made in the D.C.-Virginia area, which coincided with his USCIS immigration interview on his lawful permanent residence application that was ultimately approved; and, in and around February 2018, when purchases were again made in the D.C.-Virginia area, which coincided with his naturalization interview in Fairfax, Virginia.

*Email Communication*

32.     Additionally, GALLAGHER used her Gmail and DOS work email accounts to send emails to various people about her separation from KALUGIN after May 2016.  For

10

example, on or about June 1, 2016, GALLAGHER wrote to a an individual with initials X.V. by email and explained that she was excited to go to Matamoros, Mexico, for her first posting, but that "[KALUGIN] decided not to go though. He went back to California." On or about that same day, using her work email account, GALLAGHER wrote to a Department of State mentor an email message in which she introduces herself as "27 years old and single with two dogs."

33. On or about June 14, 2016, GALLAGHER wrote to an individual at the DOS Family Liaison Office (FLO) to request a status update on KALUGIN's green card application. Approximately ten minutes later, GALLAGHER emailed an individual with initials C.L., stating that GALLAGHER and KALUGIN "separated and he left to go back to California. He is living in Sacramento near his friends and much happier there [sic]." Furthermore, in a June 24, 2016 email from GALLAGHER's mother, L.G., to another individual in which GALLAGHER was copied, GALLAGHER's mother reported that "Laura and her fiancé broke up."

34. On or about July 21, 2016, a day before KALUGIN's interview on his Form I-485 application based on his marriage to GALLAGHER, an individual with initials S.D., who was one of GALLAGHER's former colleagues, emailed her and asked if GALLAGHER was now "'officially' engaged and/or married". GALLAGHER responded a few days later and explained that "Andrey and I ended up breaking up shortly after we got to Virginia because he does not want a life of living overseas. He moved back to California […] We still talk almost every day but we are 'just friends.' It is all for the best."

35. Email records also confirm GALLAGHER purchased airline tickets for KALUGIN's travel to Virginia via IAD – Washington Dulles International Airport, with his flight departing Sacramento, CA on July 16, 2016 and returning on July 24, 2016 (the time of his USCIS adjustment of status interview).

*Sworn Statements to the U.S. Government*

36. GALLAGHER further describes her date of separation in sworn written accounts to the United States Government. In GALLAGHER's May 27, 2019 Electronic Questionnaires for Investigations Processing (e-QIP SF86), a document completed under penalty of perjury and used as part of a routine quinquennial background re-investigation for top secret clearance, she noted her date of separation from KALUGIN was "5/1/2016 (Estimated)."

C. <u>Maintaining the Appearance of Marriage with the DOS Family Liaison Office (FLO)</u>

37. Despite the dissolution of their relationship, GALLAGHER continued to pursue KALUGIN's naturalization through the special 319(b) naturalization mechanism available to U.S. diplomats, discussing the paperwork and emailing documents back and forth between herself and KALUGIN, as well as communicating with the FLO, the State Department office that serves as the liaison between USCIS and foreign service officers requesting 319(b) naturalization.

38. WITNESS-1, who at the time was working in the FLO and was GALLAGHER's main point-of-contact, recalls GALLAGHER first approaching their office as a "walk-in" client. Government records show that on or about April 15, 2016, GALLAGHER sent to WITNESS-1 an email containing USCIS documents related to obtaining employment authorization for foreign nationals.

39. On or about June 20, 2016, despite having separated from KALUGIN just weeks before, GALLAGHER continued to represent herself and KALUGIN as being together and sent WITNESS-1 an email stating that KALUGIN's interview with USCIS for his Form I-485 was scheduled for July 22, 2016.

40. On or about July 22, 2016, the pair began preparing the paperwork required to apply for 319(b) naturalization. GALLAGHER's email records show that the FLO emailed her a

blank 319(b) naturalization paperwork packet, which included a checklist and a blank Form N-400. GALLAGHER's email records further indicate that she collaborated with KALUGIN on this process via email. On or about August 21, 2016, GALLAGHER emailed KALUGIN and asked him to review and return an immigration form related to authorization for a credit card transaction, as well as to ask for a scan or photograph of both sides of his green card.

41. On August 25, 2016, GALLAGHER sent the N-400 and supporting documents to KALUGIN to review, then on that same day, sent the completed materials to FLO.

D. False Statements Contained in KALUGIN's N-400 Application for Naturalization

42. I have reviewed KALUGIN's N-400 Application for Naturalization, which he signed under penalty of perjury on August 30, 2016. Part 5, titled "Information About Your Residence," of this form instructs an applicant to list "where you have lived during the last five years," and continues to instruct applicants to "provide your most recent residence and then list every location where you have lived for the past five years." KALUGIN's N-400 falsely listed his "current physical address" in 1.A. of this section as "550 14th Rd. S" in Arlington, Virginia, and listed the "Dates of Residence" as "04/01/2016" to "present," despite having applied for a new driver's license in California when he moved there in May 2016. Question 1.B. of this section further asks the applicant to list his or her "Current Mailing Address (if different from the address above)" which KALUGIN's N-400 left blank, indicating that KALUGIN's current physical address and his mailing address are one in the same.

43. Based on my investigation, and as detailed in paragraphs 25-34 of this affidavit, KALUGIN had moved from Arlington, Virginia to Sacramento, California in and around May or June of 2016. On or about May 31, 2016, KALUGIN applied for, and received a California Driver's license at a residence on Emsdale Way in Sacramento, California. He further listed

13

himself at that address to his employer, a security company where he worked as a security guard. Notably, KALUGIN did not update his address with USCIS to the Emsdale Way address until on or about December 21, 2016, close to the time GALLAGHER would move for her diplomatic posting in Matamoros, Mexico.

44. Further, in Part 8 "Information About Your Employment" of the N-400, KALUGIN listed himself as being unemployed from "04/01/2016" until "08/09/2016" at "550 14th Rd. S" in Arlington, Virginia, and then working as a security officer beginning on "08/09/2016" to "present" for an employer in Sacramento, California.

45. In Part 10, Question 1, the N-400 asks an applicant to indicate his or her marital status by checking a box; the options are "Single, Never Married," "Married," "Divorced," "Separated," and "Marriage Annulled." KALUGIN's N-400 listed himself as "Married," and not "Separated," despite being separated from GALLAGHER both romantically and physically at the time of his filing in August 2016.

46. Part 12 asks in Question 31 if the applicant has "**EVER** given any U.S. government officials **any** information or documentation that was false, fraudulent, or misleading?" Question 32 of this same section asks if the applicant has "**EVER** lied to any U.S. government officials to gain entry or admission to the United States or to grain immigration benefits while in the United States?" KALUGIN's N-400 has "no" checked next to both of these questions. In truth and fact, I believe that KALUGIN previously gave false and fraudulent answers to USCIS.

47. Before submitting an N-400 application, Part 13 of the N-400 requires that the submitting applicant sign a statement and certification "under penalty of perjury" and that the applicant "understand[s] all of the information contained in, and submitted with, my application,

14

and that all the information is complete, true, and correct." KALUGIN signed this application, and dated the signature as "08/30/2016."

E. GALLAGHER's Single Life and Concealment of the Separation

48. After submitting KALUGIN's N-400 and related paperwork, GALLAGHER and the FLO exchanged approximately 89 emails during the period between in and around August 2016 and in and around February 2018. In these emails, GALLAGHER pressed for status updates, advice, and assistance in advancing KALUGIN's 319(b) naturalization process.

49. On or about November 15, 2016, GALLAGHER emailed WITNESS-1 at FLO that KALUGIN did not have a valid Russian passport and could not travel with her to her post in Mexico; instead, they were considering having KALUGIN move to her parents' house in Los Gatos, California. However, she failed to mention that KALUGIN had moved back to California on his own several months prior.

50. As part of this investigation, I also interviewed WITNESS-2, who worked with GALLAGHER at the U.S. Embassy in Matamoros, Mexico. WITNESS-2 stated that GALLAGHER made it openly known at work that while she was technically married to KALLUGIN, their marriage was only for immigration purposes. According to WITNESS-2, GALLAGHER told WITNESS-2 directly that she was separated from her husband and "totally over it," but that she could not divorce him until he naturalized.

51. In another interview, WITNESS-3 stated that in and around August 2017, while on temporary assignment in Santo Domingo, Dominican Republic, GALLAGHER told WITNESS-3 that while she was still technically married, GALLAGHER and her husband broke up a long time ago and were only still married so that KALUGIN could get immigration benefits.

15

52. On or about August 5, 2017, GALLAGHER wrote in an email to a former co-worker that she "met a nice guy[, D.S.A.,] [in Santo Domingo] that I am dating." Four days later, on or about August 9, 2017, GALLAGHER wrote to FLO to check on the status of KALUGIN's 319(b) naturalization application without mentioning her current marital status with KALUGIN.

53. WITNESS-3 also told law enforcement that GALLAGHER continued to date D.S.A. even after returning to her permanent diplomatic post in Mexico. Indeed, Facebook records show that GALLAGHER and D.S.A. took a photo together in and around September 2017. A review of email records also show that, in and around October 2017, GALLAGHER returned to Santo Domingo, Dominican Republic to visit D.S.A. Meanwhile, GALLAGHER emailed FLO on different occasions throughout September and October 2017 to request a status update of KALUGIN's 319(b) naturalization.

54. Furthermore, as an entry-level FSO, GALLAGHER had to provide DOS a list of ranked preferences of locations for her next post, as she would have been eligible to leave her post in Mexico beginning in and around December 2018. A review of GALLAGHR's email shows her account sent to others a spreadsheet that included overseas post locations with comments, such as "good place for singles, sounds like a vibrant social life"; "hard place to be a single female"; or whether there was a good quality of life "for me and Cella (GALLAGHER's dog)." In her submission to a DOS Career Development Officer who works for the Bureau of Global Talent Management, GALLAGHER stated she would like to serve at a post "1) where [her] dog, pit bull, is able to travel; 2) with few security restrictions so I can travel (as a female alone)."

F.  KALUGIN's Naturalization as a United States Citizen

55.     On December 5, 2017, the FLO informed GALLAGHER that KALUGIN's naturalization interview was scheduled for February 5, 2018.  GALLAGHER emailed KALUGIN from her U.S. Government work email and provided him direction and instructions for the naturalization interview and process.  Email records further establish that GALLAGHER once again purchased airfare for KALUGIN to fly to the Washington, D.C. area via DCA – Reagan National Airport on February 4, 2018, and return to Sacramento, California on February 7, 2018.

56.     On or about February 5, 2018, KALUGIN appeared at the USCIS Office in Fairfax, Virginia, located in the jurisdiction of the Eastern District of Virginia for his naturalization interview with a USCIS IO.  During the sworn interview, KALUGIN re-confirmed several of his answers on his N-400.  In particular, in Part 10, Question 1, KALUGIN affirmed his current marital status was "Married" and his spouse's name was Laura Anne Gallagher, even though KALUGIN and GALLAGHER had separated in May 2016.  He also affirmed his response of "No" to Questions 31 and 32, which asked whether he had given false or misleading information to U.S. Government officials or otherwise lied to U.S. Government officials to gain immigration benefits while in the United States, respectively.

57.     At the naturalization interview, KALUGIN again signed his name to affirm under penalty of perjury that the contents of the Form N-400, including any corrections made during the interview, are complete, true, and correct.  The Form N-400 only indicates KALUGIN made one correction to his prior answers.

58.     Based on the 319(b) naturalization, the USCIS IO also prepared a required Record of Sworn Statement, which asked, in part, whether KALUGIN could "declare in good faith that, upon naturalization," he intended to reside abroad with his citizen spouse.  KALUGIN

17

responded, "Yes."  The Statement also asked KALUGIN if he declared in good faith that he intended to take up residence within the United States with his spouse "immediately upon the termination of their employment abroad?," to which he responded, "Yes."  KALUGIN then signed the form under oath, certifying that his answers were "full, true, and correct."  In truth and fact, as KALUGIN well knew, he and GALLAGHER had been residing separately since approximately May 2016 and that he had no good faith intention to reside abroad with her.

59.     USCIS, as customary for 319(b) naturalizations, completed KALUGIN's naturalization on the same day at an oath ceremony at the USCIS office in Fairfax, Virginia, producing and issuing to KALUGIN a Naturalization Certificate #3XXXX685 on February 5, 2018.

60.     Based on my investigation and interview with the USCIS IO who conducted the interview, the response to Part 10, Question 1 – whether an applicant is "Married, Divorced, Separated, Widowed, or Single," is important in determining the applicant's eligibility for 319(b) naturalization.  A true response of "Separated," for example, would have changed the outcome of the interview.

G. KALUGIN's Receipt of a Diplomatic Passport and Travel Following His Naturalization

61.     On the day of his naturalization, KALUGIN also applied for two U.S. Passports, a personal passport and a Diplomatic passport, at the U.S. Department of State's Special Issuance Agency in Washington, D.C.  As proof of eligibility for these U.S. Passports, KALUGIN provided his fraudulently-procured Naturalization Certificate issued earlier that day by USCIS, as evidence of his U.S. Citizenship.

62.     On or about March 23, 2018, KALUGIN traveled to Mexico, crossing at the Brownsville, Texas land border crossing.  As part of the conditions of 319(b) naturalization, the

newly naturalized U.S. citizen spouse must leave the United States within 45 days, by regulation, to fulfill their sworn oath of good-faith intent to live with a U.S. Government spouse abroad for the duration of the spouse's tour. During an interview with law enforcement, WITNESS-2 stated that GALLAGHER said her husband had to come to Post in Mexico as some kind of provision of his expedited naturalization, and that GALLAGHER said that since KALUGIN was living with her they would give it a chance. However, KALUGIN spent only two weeks and six days in Mexico before returning to the United States in and around April 2018. Government records show that he has not left the United States since.

63.     On or about July 7, 2018, GALLAGHER messaged with an individual with initials M.M. on Facebook. GALLAGHER wrote that she was excited to get divorced so she could be more honest with her current boyfriend. Specifically, GALLAGHER explained, "now I'm deleting from my Facebook any photos of me with andrey, [D.S.A.], and/or any other guy I dated/hit on […] I don't want to have to lie anymore."

64.     As noted above, GALLAGHER filed for divorce in California on or about July 13, 2018 based, in part, on a separation date of May 1, 2016. As of the date of this affidavit, KALUGIN maintains possession of both U.S. Passports, including his Diplomatic Passport.

//

//

(continued on next page)

## CONCLUSION

65. For the foregoing reasons, I state that there is probable cause to believe that violations of 18 U.S.C. §§ 1425 and 2 (naturalization fraud and aiding and abetting) have been committed by LAURA ANNE GALLAGHER and ANDREY NIKOLAYEVICH KALUGIN.

GREGORY E NEWMAN
Digitally signed by GREGORY E NEWMAN
Date: 2020.12.08 11:33:43 -05'00'

Gregory E. Newman
Special Agent
Diplomatic Security Service
Department of State

Respectfully submitted and attested to in accordance with the requirements of Fed. R. Crim. P. 4.1 via telephone on this ___ day of _____, 2020.

Digitally signed by Michael S. Nachmanoff
Date: 2020.12.08 15:23:09 -05'00'

The Honorable Michael S. Nachmanoff
United States Magistrate Judge