IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | **Criminal Case No. 1:21-cr-43** |
| | ) | |
| **LAURA ANNE GALLAGHER and** | ) | |
| **ANDREY NIKOLAYEVICH KALUGIN** | ) | |

## MEMORANDUM OPINION

After a seven-day jury trial, a federal jury convicted both defendants, Laura Anne

Gallagher ("Gallagher") and Andrey Nikolayevich Kalugin ("Kalugin"), of all three counts

charged in the Indictment: (i) conspiracy, in violation of 18 U.S.C. § 371; (ii) unlawful

procurement of naturalization based on false statements made in the Form N-400, Application

for Naturalization ("Form N-400"), in violation of 18 U.S.C. §§ 1424(a), (2); and (iii) unlawful

procurement of naturalization based on false statements made in the Record of Sworn Statement,

in violation of 18 U.S.C. §§ 1424(a), (2). Both defendants have now filed post-verdict motions

for a judgment of acquittal and motions for a new trial, pursuant to Rules 29 and 33, Fed. R.

Crim. P.[1]

Defendants' Rule 29 motions argue that the trial evidence was insufficient to support a

conviction on any count of the Indictment. Kalugin's Rule 33 motion, which Gallagher joins,

raises the separate question whether Facebook messages between the defendants were properly

excluded as hearsay during trial. The government opposes both motions.

---

[1] Following the close of the government's case in chief, defendants orally moved, and Kalugin filed a written
motion, for judgment of acquittal. Those motions were denied. The pending motions are renewed motions for
judgment of acquittal following defendants' convictions on all counts of the Indictment. Defendants have also filed
motions adopting their co-defendant's motions, such that each defendant seeks to raise the same arguments in
support of acquittal or a new trial. Defendants' motions to adopt and join are granted.

**I.**

After meeting at UC Davis School of Law, defendants married in June 2015. At the time,

Kalugin was a Russian national and was present in the United States on an F-1 visa that was set

to expire on July 15, 2015.  Shortly after Gallagher and Kalugin married, defendants filed

applications to register Kalugin as a permanent resident or to adjust his status with the United

States Citizenship and Immigration Services ("USCIS") which would permit Kalugin to remain

in the United States based on his marriage to a citizen.  In April 2016, while Kalugin's

immigration applications were pending, defendants moved from California to Arlington, Virginia

for Gallagher's A-100 training course for new Foreign Service Officers ("FSO") with the

Department of State.

Testimony and exhibits at trial established that Kalugin left Arlington, Virginia to return

to Sacramento, California soon thereafter, around May 2016.[2]  In summer and fall 2016,

Gallagher began to hold herself out as being single.  *See* Govt. Exhs. 15E, 15F (June 2016 emails

from Gallagher indicating that she was single); Sept. 2 Trial Tr. at 65:15-66:11 (Gallagher joined

a "singles only" Facebook group). Gallagher also disclosed to colleagues that she and Kalugin

had broken up because Kalugin did not want to live abroad.  *See* Govt. Exhs. 15E, 15G, 15H,

13C; Sept. 2 Trial Tr. at 62:18-24; *id*. at 160:23-161:1.  Those same colleagues testified that

Gallagher informed them that she was staying married to Kalugin as part of an agreement so that

Kalugin could obtain U.S. citizenship. *See* Sept. 2 Trial Tr. 62:22-24; *id*. at 133:13-16. Also, in

May 2016, Kalugin renewed his California driver's license and listed his address on that driver's

---

[2] *See* Govt. Exh. 5A (DMV records); Govt. Exh. 12A, 12B (bank records); Govt. Exhs. 15E, 15F (June 2016 emails relaying that Kalugin had returned to California); Sept. 8 Trial Tr. at 50:23-24 (Gallagher testifying "So I was still living in Arlington, Virginia, and he had gone back to California, I think at the end of May"); *id*. at 112:13-15 (Gallagher testifying "He started going back to California near the end of May"); Sept. 9 Trial Tr. at 23:19-22 (Kalugin testifying that in May 2016 he moved to Sacramento, California).

license as Emsdale Way, Sacramento, California, where he paid rent for a room. Upon her arrival

at her post in Mexico, Gallagher informed the Community Liaison Officer that Kalugin did not

want to travel abroad and would not be joining Gallagher at post in Mexico. *See* Sept. 2 Trial Tr.

at 160:23-161:1. In 2017, while stationed at a second post in the Dominican Republic, Gallagher

met and began a romantic relationship with Diego Sanchez Almanzar.

Despite living apart from one another, defendants jointly continued to press Kalugin's

immigration process based on defendants' marriage to each other. USCIS interviewed Kalugin

for his green card (Form I-485) application on July 22, 2016 in Fairfax, Virginia after Kalugin

had moved to Sacramento, California. USCIS approved Kalugin's application and Kalugin was

granted lawful resident status based on his marriage to Gallagher.

In August 2016, Gallagher emailed Kristina Rudolph, an expeditious naturalization

specialist with the Department of State, for guidance regarding expeditious naturalization for

Kalugin. *See* Sept. 2 Trial Tr. at 88:6-8. As Rudolph testified at trial, expeditious naturalization is

available to assist foreign-born spouses of FSOs to become citizens on an expedited basis. To be

eligible for expeditious naturalization pursuant to Section 319(b) of the Immigration and

Nationality Act: (i) an applicant must be a green card holder; (ii) the FSO had to have orders to

go overseas; and (iii) the tour overseas has to be for at least one year or longer. *See id.* at 88:16-

22. The expeditious naturalization option permitted Kalugin to apply for citizenship

immediately rather than await the three- or five-year period prescribed under other naturalization

provisions.

On August 30, 2016, defendants jointly submitted the Form N-400 to USCIS in support

of Kalugin's application for expeditious naturalization. *See* Govt. Ex. 1E. Although the Form

N-400 was submitted on behalf of Kalugin, Gallagher testified that she completed the Form N-

400. *See* Sept. 8 Trial Tr. at 122:21-123:6. Before Gallagher submitted the Form N-400, Kalugin reviewed and signed the form. *See id.*; Sept. 9 Trial Tr. at 28:2-9. Additionally, Gallagher entered her appearance as counsel for Kalugin with USCIS through the submission of Department of Homeland Security Form G-28, Notice of Entry of Appearance as Attorney or Accredited Representative.

On the Form N-400, defendants represented that Kalugin's current physical address as of August 2016 was 550 14th Street in Arlington, Virginia and that he had resided there from April 2016 until at least the time the Form N-400 was signed on August 30, 2016. At the time defendants submitted the Form N-400, and for months prior to the submission of the Form N-400, Kalugin was in fact living in Sacramento California.

The Form N-400 also asks applicants to indicate, by checking the appropriate box in response, "What is your current marital status?" The Form provides six possible responses: (i) single, never married; (ii) married; (iii) divorced; (iv) widowed; (v) separated; and (vi) marriage annulled. *See* Govt. Exh. 1E. Defendants marked the box "Married." After filling out the substantive information requested in the Form N-400, Kalugin then represented that he had never given any government officials information or documentation that was false, fraudulent, or misleading and represented that he had never lied to any government official to gain entry or admission to the United States or to gain immigration benefits while in the United States.

After submitting the Form N-400, Gallagher indicated to Rudolph – the expeditious naturalization specialist – that Kalugin would be residing with Gallagher's parents in California when Gallagher left for post. This statement was false; at the time Gallagher made the statement, Kalugin had already been living in California for months and, contrary to Gallagher's representation, defendants never intended for Kalugin to live with Gallagher's parents. *See* Sept.

4

8 Trial Tr. at 128:10-21.

In December 2016, after receiving her orders to post in Mexico, Gallagher submitted a change of address form for Kalugin to USCIS indicating that Kalugin would be living in Sacramento, California. At that time, Kalugin had been living in Sacramento, California for months.

In February 2018, Kalugin flew from California to Virginia for his interview with USCIS. This interview occurred at the USCIS office in Fairfax, Virginia. During the interview and in the Record of Sworn Statement signed at the time of the interview, Kalugin represented that he had a good faith intention to reside abroad with Gallagher. He also represented that he intended to take up residence within the United States with his spouse immediately upon termination of Gallagher's employment abroad. That same day, based on defendants' representations in the Form N-400 and Record of Sworn Statement, Kalugin was issued a Certificate of Naturalization. Immediately thereafter he applied for U.S. diplomatic and tourist passports.

Although Kalugin did visit Gallagher at her post in Mexico, Kalugin stayed less than one month and crossed the border into the United States on multiple occasions during his visit to Gallagher in Mexico. Following Kalugin's final departure from Mexico after this short visit, Gallagher filed for divorce in the Superior Court of California and listed "01-May-2016" as the date of their separation. Govt. Exh. 8A. That petition was signed by Gallagher under penalty of perjury.

## II.

The Indictment charged both defendants with the following three counts:

- Count I charged defendants with conspiracy and alleged that defendants conspired to obtain naturalization and citizenship and proof of U.S. citizenship

5

by making false statements and submitting fraudulent documents.[3]

- Count II charged defendants with knowingly procuring, obtaining, and aiding and abetting the procuring of citizenship and naturalization contrary to law by making false, fictitious statements in the Form N-400 by:

    o (i) falsely representing that Kalugin lived in Arlington, Virginia from April 2016 to February 2018;

    o (ii) falsely representing that defendants were married;

    o (iii) falsely representing that Kalugin had never given government officials information that was false, fraudulent, or misleading; and

    o (iv) falsely representing that Kalugin had never lied to any government official to gain immigration benefits while in the United States.

- Count III charged defendants with knowingly procuring, obtaining, and aiding and abetting the procuring of citizenship and naturalization contrary to law by making false, fictitious statements in the Record of Sworn Statement by:

    o (i) falsely representing that Kalugin had a good faith intention to reside with Gallagher abroad upon his naturalization; and

    o (ii) falsely representing that Kalugin intended to take up residence within the United States with Gallagher upon the termination of her post abroad.

After a seven-day trial, including the admission of numerous exhibits, and substantial

testimony from approximately twenty witnesses, including both defendants, the jury found both

---

[3] At trial and in their papers, the parties sometimes referred to multiple objects of the conspiracy. This is inaccurate; the Indictment alleges only one object of the conspiracy. Specifically, in the section entitled "Object of the Conspiracy," the Indictment only alleges a single object of the conspiracy: "The purpose of the conspiracy was to obtain naturalization and citizenship and proof of U.S. citizenship by making false statements and submitting fraudulent documents." *See* Indictment at 10. In the prefatory paragraph of Count I to the Indictment, the government alleges the following: (i) defendants sought to defraud the United States by impeding, impairing, and obstructing the lawful government functions of USCIS with respect to the application, interview, and decision-making process; (ii) defendants did knowingly procure, contrary to law, the naturalization of any person; (iii) defendants did knowingly make false statements under oath in any case, proceeding, or matter relating to, and under, and by virtue of any law of the United States relating to naturalization; and (iv) defendants sought to use any certificate of naturalization knowing the same to have been procured by fraud and false evidence and otherwise unlawfully obtained. *See id.* at 9.

defendants guilty of all three counts in the Indictment. In addition to the exhibits admitted and the testimony heard during trial, Kalugin attempted to introduce communications between defendants on Facebook Messenger to show that Kalugin believed that his marriage was not over. *See* Dkt. 189-1 ("Def. Exh. 30"). Those messages were excluded as inadmissible hearsay. Despite the exclusion of Defense Exhibit 30, defendants both testified as to the substance of the messages, including that defendants called each other affectionate pet names and that they loved each other. *See* Sept. 9 Trial Tr. at 15-17 (Kalugin testifying to pet names such as "Mama," "Papa," "my beautiful one," "adorable," and "baby"); Sept. 8 Trial Tr. at 27-28 (Gallagher testifying to pet names such as "Andruska," "Larusha," and "Larechka"); *id*. at 195:19-20 (Kalugin testifying that he loved Gallagher)

### III.

Rule 29, Fed. R. Crim. P., governs motions for judgment of acquittal. In reviewing a motion for judgment of acquittal, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). A court must allow "the government the benefit of all reasonable inferences from the facts proven to those sought to be established." *United States v. Tresvant*, 677 F.2d 1018, 1021 (4th Cir. 1982). Importantly, the Fourth Circuit has noted that, "[t]he jury, not the reviewing court, weighs the credibility of the evidence and resolves any conflicts in the evidence presented." *United States v. Murphy*, 35 F.3d 143, 148 (4th Cir. 1994). And, as the Fourth Circuit has also noted, in weighing inconsistencies, "[w]e also assume that the jury resolved all contradictions in the testimony in favor of the government." *United States v. Moye*, 454 F.3d 390, 394 (4th Cir. 2006) (citing *United States v. Sun*, 278 F.3d 302, 313 (4th Cir.

7

2002)).

## A. COUNT II[4]

The government charged defendants with making four false statements on the Form N-400, any one of which could support a conviction on Count II. Here, defendants challenge the sufficiency of the evidence that: (i) any of the statements alleged in the Indictment were false; and (ii) the materiality of Kalugin's representation regarding his residence. For defendants to succeed on their motion with respect to Counts II and III, the government must have failed to produce sufficient evidence with respect to each of the statements alleged to have been false in the Indictment. Each alleged false statement alleged in the Indictment will be addressed separately below.

### *1. Defendants' Marital Status*

Defendants first argue that the representation on the Form N-400 that defendants were married was not false and thus cannot support the conviction under Count II pursuant to 8 U.S.C. § 1425. The government argues that defendants' relationship was "essentially over" and therefore it was false to select the "married" option on the Form N-400. The government's use of the term "essentially" in their response brief demonstrates the ambiguity in the Form N-400. Because it was technically true that defendants were married when the Form N-400 was completed, that representation cannot form the basis for a conviction pursuant to § 1425.

Much of the parties' briefing, consistent with the evidence at trial, focuses on whether the term "separated" is ambiguous and whether defendants should have selected the "separated" option on the Form N-400. This is the wrong focus. Regardless of whether the term "separated"

---

[4] Both defendants begin their arguments with a focus on Count II as much of the evidence and testimony introduced at trial focused on the four statements alleged to be false in Count II. Thus, analysis of defendants' motions for judgment of acquittal properly begins with Count II.

is fundamentally ambiguous, the term married is not. Here, the government must prove that the selection of "married" was false – not that another option was a more accurate or better choice – as courts have long recognized that a defendant cannot be convicted for making a false statement where the statement is technically or literally true. *See Bronston v. United States*, 409 U.S. 352, 362 (1973) (holding that "any special problems arising from the literally true but unresponsive answer are to be remedied through the 'questioner's acuity' and not by a federal perjury prosecution").[5] The evidence submitted at trial is not sufficient to establish that defendants falsely represented themselves as married. Defendants married in 2015 and were still married at the time the Form N-400 was submitted and at the time that the February 2018 interview was conducted. Thus, defendants' representation that they were married in the Form N-400, although perhaps misleading, was literally true and cannot support a conviction on Count II.

A similar factual scenario was presented in *United States v. Moses*, 94 F.3d 182 (5th Cir. 1996). In that case, the defendant faced multiple charges for making false statements regarding his marriage in relation to his application for citizenship. The Fifth Circuit upheld a conviction related to whether the defendant's representation that he was "living in marital union" with his citizen spouse in an immigration petition, because the defendant had separated from his wife before filing the petition. *Id*. at 187. The government also charged the defendant with making false representations with respect to the Form N-445, filed after defendant had submitted his petition. In the Form N-445, defendant replied "no" to a question asking: "After the date you filed your petition: 1. Have you married, or been widowed, separated, or divorced?" *Id*. at 188.

---

[5] *United States v. Earp*, 812 F.2d 917, 919–20 (4th Cir.1987) (finding that a literally true statement, albeit unresponsive, cannot support a conviction under 18 U.S.C. § 1623); *United States v. Mandanici*, 729 F.2d 914, 920–21 (2d Cir.1984) ("[A] defendant may not be convicted under § 1001 on the basis of a statement that is, although misleading, literally true.").

Because the defendant had separated *before* filing his petition, it was literally true that the defendant had not separated from his spouse *after* filing his petition. The Fifth Circuit stated "[w]e do not condone, but rather condemn, Moses's lack of candor with the INS…[but] [w]e cannot uphold a conviction" where the alleged false statement "is true on its face." *Id.* The Fourth Circuit has reached similar results in other contexts.[6] Here, as in *Moses*, defendants' response regarding their marital status was misleading, but technically true and thus cannot support a conviction.

Additionally, as the Fourth Circuit noted in *United States v. Sarwari*, 669 F.3d 401 (4th Cir. 2012, "[t]he answer to a fundamentally ambiguous question may not, as a matter of law, form the basis for a false statement." *Id*. at 407. A question is fundamentally ambiguous when it "is not a phrase with a meaning about which men of ordinary intellect could agree, nor one which could be used with mutual understanding by a questioner and answerer unless it were defined at the time it w[as] sought." *Id*. The term "separated" in the Form N-400 is undefined therein and leaves it unclear whether it refers to legal separation, physical separation, or some other kind of separation.[7] The line between "separated" and "married" becomes further blurred

---

[6] *See United States v. Good,* 326 F.3d 589, 591–92 (4th Cir.2003) (reversing a false statement conviction based on the defendant's negative response to a question as to whether she had been convicted of "Burglary, Theft, Armed robbery, Possession or Distribution of Stolen Property ... [,] Dishonesty, Fraud, or Misrepresentation" was "literally true," despite her conviction for embezzlement); *United States v. Hairston,* 46 F.3d 361, 375–76 (4th Cir.1995) (reversing a conviction when context made it "obvious" that the defendant used the word "prepare" in a particular manner and so her answer was literally true); *United States v. Earp,* 812 F.2d 917, 918–20 (4th Cir.1987) (reversing a conviction where the defendant's answer to a question—whether he had ever burned crosses at the residences of interracial couples—was literally true, though arguably intended to mislead given that the defendant had stood watch with a shotgun while others tried and failed to light the cross).

[7] The government conceded that "there's no definition of the word 'separated' in the Form N-400," but argued that it means "living apart." Sept. 7, 2021 Trial Tr. at 112:2-4. But that definition would lead to the anomalous result where someone who was married, but formally and legally separated, yet living together with his or her spouse would be able to claim "married" status on the Form N-400 while someone who was married, but living apart from their spouse due to visa issues or finances, could not claim "married" status on the Form N-400. This further demonstrates the fundamental ambiguity of the term "separated."

when one examines the guidance provided by USCIS as to marital status. As Kalugin notes, USCIS guidance states:

> The spouse of a U.S. citizen employed abroad is not required to have lived in marital union with his or her citizen spouse. The spouse only needs to show that he or she is in a legally valid marriage with a U.S. citizen from the date of filing of the application until the time of the Oath of Allegiance.[8]

Indeed, USCIS Officer Juan Wood, the decision-maker on Kalugin's naturalization application, apparently was not clear on what "separated" meant in the context of the Form N-400 and, therefore, testified that he would ask applicants who responded in that way: "what do you mean, separated?" *See* Sept. 3, 2021 Trial Tr. at 41:2-8.[9]  Because it appears that persons of ordinary intelligence would not be able to agree on what the term "separated" means in the context of the Form N-400, the use of that term there is fundamentally ambiguous and cannot support a conviction. [10]

---

[8] *Policy Manual*, USCIS (Oct. 2021), *available at* https://www.uscis.gov/policy-manual/volume-12-part-g-chapter-4 (last visited Jan. 24, 2022).  The government objects to consideration of the Policy Manual definition, but whether USCIS has a different definition of "married" and "separated" than that proffered by the government at trial goes to whether the question is fundamentally ambiguous.

[9] The government cites other portions of Officer Wood's testimony as demonstrating that separation has a clear meaning. It does not.  In the portion of the transcript cited by the government, Officer Wood testified "I just want to make sure that they're still married."' Sept. 3, 2021 Tr. at 70-71.  Here, Gallagher and Kalugin were still married and Officer Wood's motive does not shed any light on whether the appropriate box to check was "married" or "separated."

[10] The government and defendants each cite to *United States v. Harra*, 985 F.3d 196 (3d Cir. 2021) to support their position. In *Harra*, the Third Circuit addressed whether, when a question is ambiguous but not fundamentally so, the government bears the burden of proving falsity under each objectively reasonable interpretation of the requirement. The Third Circuit, joining the Eleventh, First, Tenth, Eighth, and Fifth Circuits, held that the government must prove that "its interpretation is the only reasonable one or that the defendant's statement is false under each reasonable interpretation."  *Id.* at 214.  As the Third Circuit noted, the Fourth Circuit appears to have conflicting decisions on this point.  In *Sarwari*, the Fourth Circuit suggested that, when a question is not fundamentally ambiguous but merely susceptible to multiple interpretations, the jury determines whether the defendant knew his statement was false.  669 F.3d at 407. Yet, other cases from the Fourth Circuit, suggest a defendant cannot be convicted for a reasonable interpretation of a question. *See United States v. Race*, 632 F.2d 1114, 1120 (4th Cir. 1980).  It is unnecessary to resolve any apparent conflict in Fourth Circuit authority here for two reasons.  First, because the term "married" is unambiguous and defendants' representation that they were married was literally true and thus cannot support a conviction.  Second, even if the selection of "married" was not literally true, the term "separated" is fundamentally ambiguous such that persons of ordinary intelligence could not agree on a meaning of the term "separated" in this context.

In sum, the government produced no evidence that it was false for defendants to represent that they were married at the time the Form N-400 was completed or the February 2018 interview took place.  Indeed, the evidence demonstrated that defendants were married during that time.  Because defendants' representation was the literal truth, it cannot support a conviction for making a false statement.  Even assuming *arguendo* that was not the case, the term "separated" is so fundamentally ambiguous that men of ordinary intellect – including the decision-maker in this case – could not agree what "separated" meant.  Accordingly, defendants' representation about their marital status cannot support a conviction under Count II.

This conclusion does not end the analysis regarding the sufficiency of the evidence with respect to Count II because where a case is submitted to the jury on multiple theories and the jury returns a general guilty verdict, "the verdict stands if the evidence is sufficient with respect to any of the acts charged."  *United States v. Durman*, 30 F.3d 803, 810 (7th Cir. 1994); *see also Griffin v. United States*, 502 U.S. 46, 49 (1991).  Thus, so long as there is sufficient evidence that one of the alleged false statements charged in Count II is false, that conviction must stand.[11]

_____

[11] At trial, Kalugin requested that the verdict form include a special interrogatory for each count requiring the jury to indicate that the jury was unanimous as to a particular false statement for Counts II and III.  *See* Sept. 9 Trial Tr. at 178:8-179:23; *id.* at 207:7-13; Sept. 10 Trial Tr. at 13:1-15.  This request was denied because the instructions were clear that the jury had to be unanimous as to at least one false statement.  Specifically, the instructions provided that:

> "[F]or you to find that the defendant procured citizenship or naturalization contrary to law, you must unanimously agree that the defendant knowingly made at least one of the materially false representations alleged in Count 2 and Count 3 of the Indictment.  You may only convict if all agree on which statement or statements of the defendant – that the defendant made that was materially false."

This instruction is substantially similar to the instructions proposed by defendants and is supported by Fourth Circuit precedent.  *See* Dkt. 139; Dkt. 143; *United States v. Sarihifard*, 155 F.3d 301, 310 (4th Cir. 1998) ("[W]hen an indictment charges multiple instances of conduct listed in the conjunctive, a jury verdict of guilty will stand if the jurors unanimously agree as to only one of the instances of conduct alleged in the indictment.").

In their Rule 29 and Rule 33 motions, defendants do not renew their objection to the failure to include any special interrogatories in the verdict form.  In any event, as the Fourth Circuit has held "the use of special interrogatories is disfavored in criminal trials" and the "the ultimate decision whether to employ such a form is a matter submitted to

### *2. Kalugin's Current Physical Address*

Defendants next argue that their representation that Kalugin lived in Arlington, Virginia at the time the Form N-400 was submitted (on August 30, 2016) was not a false or material misrepresentation.  The Form N-400 asked for a "Current Physical Address" and defendants responded that Kalugin lived in Arlington, Virginia.  Yet, evidence at trial clearly established that by the time the Form N-400 was submitted, Kalugin had been living in Sacramento, California for months, had a California driver's license, and used a California address on his driver's license and his bank account.

Defendants argue that the listing of the Arlington address was not false because: (i) the term "residence" is ambiguous; and (ii) defendants disclosed that Kalugin was in California by listing a California employer on a separate section of the Form N-400.  Defendants argue that terms "residence" and "residency" have no established meaning. Gallagher Mot. at 21.  This argument is unpersuasive, because the statement that the government alleges is false does not turn on any definition of residence.  Instead, defendants are alleged to have responded falsely to a question seeking Kalugin's "Current Physical Address." Govt. Exh. 1E at Part 5.  There can be no ambiguity with respect to such a request for a current physical address.  The Form N-400 sought an "address" that was "current" and where Kalugin was "physically" located.  Clearly Kalugin was not then-living in Arlington, Virginia.  Nonetheless, defendants reported on the Form N-400 that Kalugin was living in Virginia.

Defendants also argue that Kalugin had no address in California to list because his life was too unstable.  Not so.  Defendant listed a California address on Emsdale Way on his driver's

---

the district court's sound discretion." *United States v. Cowden*, 882 F.3d 464, 475 (4th Cir. 2018).  It was therefore appropriate for the jury to enter a general verdict.

license, and he listed the same California address on his bank account. *See* Govt. Exh. 5A

(DMV records); Govt. Exh. 12A, 12B (bank records). Indeed, at trial, Kalugin expressed no

confusion about where he was living during this time period: he lived in Sacramento,

California.[12] Thus, in other contexts, when asked for a physical address Kalugin provided the

Emsdale Way address in California. It appears that the only times that defendants claimed

Kalugin had a Virginia address was in connection with his naturalization, apparently to suggest

that Gallagher and Kalugin were living together in Virginia, which they were not. *See* Sept. 8

Trial Tr. at 128:10-23 (Gallagher testifying that she misrepresented Kalugin's location to

Rudolph to make defendants "look better").

Defendants' argument that Kalugin's disclosure of a California employer revealed that

Kalugin was living in California is also easily rejected. Defendants assert that, in response to a

question about Kalugin's employer, Kalugin listed Inter-Con Security Systems, Inc. ("Inter-

Con") as his present employer and provided an address for Inter-Con in Sacramento, California.

Therefore, defendants argue that no reasonable factfinder could conclude that defendant lied on

one section of the form "while simultaneously being so open about the fact that he was residing

in California on the very same form." Kalugin Mot. for Acquittal at 8. This argument is

unpersuasive; the California address for Inter-Con revealed where *Inter-Con* was located, not

necessarily where Kalugin was working or living. Moreover, as Kalugin testified at trial, as a

security guard for Inter-Con he would be able to travel with Gallagher anywhere she was posted

and also be able to transfer from post to post while retaining his employment with Inter-Con.

Sept. 8, 2021 Trial Tr. at 172:1-4. Thus, the fact that Inter-Con was located in California did not

---

[12] At trial, Kalugin acknowledged that he was living in Sacramento, California. *See* Sept. 9 Trial Tr. at 30:23-31:2 ("I was living in Sacramento, Laura was in Virginia.");*id.* at 63:5-10 (testifying that he had been living in Sacramento for "a year and a half" by the time his of February 2018 interview).

answer the question as to where Kalugin was physically present or living and does not rescue the statement from falsity that Kalugin lived in Arlington, Virginia in August 2016.[13]

The evidence presented at trial was thus more than adequate for a reasonable jury to conclude beyond a reasonable doubt that defendants had falsely claimed on the Form N-400 that Kalugin was living in Arlington, Virginia in August 2016 when, in fact, Kalugin was living in Sacramento, California.[14] Indeed, Kalugin conceded that he was "living in Sacramento" at the time the Form N-400 was submitted in August 2016. Sept. 9 Trial Tr. at 30:23-31:2. A reasonable jury could also find that this omission was deliberate and knowing given that Kalugin used his Sacramento, California address in other contexts (*i.e.* his driver's license) and based on the testimony presented. *See United States v. Garcia*, 855 F.3d 615, 620 (4th Cir. 2017) (finding sufficient evidence to support a knowing misstatement where a defendant had reported certain information on the Form N-400).

Moreover, both defendants testified that they understood from Rudolph that they were *supposed* to use the Virginia address on the Form N-400, essentially testifying that Rudolph told defendants to lie. *See* Sept. 8 Trial Tr. at 99:11-18 (Gallagher); *id*. at 181:12-19 (Kalugin). But the record provides ample evidence contradicting this testimony such that the jury could have

---

[13] Even assuming *arguendo* that defendants' argument that Inter-Con's California address revealed Kalugin's location was correct (which it is not), the Form N-400 would still contain a false statement designed to make defendants look like they were living together in Arlington, Virginia. Defendants indicated that Kalugin lived in Virginia from April 2016 to "present" (when he signed the form in August 2016). Yet, defendants indicated that Kalugin was employed by Inter-Con from August 2016 to "present" and that he was unemployed and living in Arlington, Virginia from April 2016 to August 2016. Govt. Exh. 1E, Part 8. Thus, even if the Inter-Con address revealed something about Kalugin's location from August 2016 to December 2016 when defendants filed the change of address form, defendants still falsely represented that they were together in Arlington, Virginia from May 2016 to August 2016.

[14] Gallagher's brief makes much of the fact that many of Kalugin's belongings were still located in Virginia. *See* Gallagher Reply at 5. But the physical location of Kalugin's belongings is not the same as Kalugin's physical location, which is the information that was sought by the Form N-400 (*i.e.* seeking Kalugin's "Current Physical Address"). Indeed, taken to the extreme, a person couch surfing in California could use a Minnesota address, so long as all of that person's belongings were in a storage facility in Minnesota.

disbelieved both defendants' testimony on this point.  Indeed, the instructions that Rudolph

provided to defendants make clear that defendants were to use a current address "where you will

physically reside in four weeks from the date you submit [your] application."  Govt. Exh. 14E.

Additionally, as the trial evidence demonstrated, Gallagher was falsely representing to Rudolph,

the expeditious naturalization specialist, that Kalugin was living with Gallagher in Arlington,

Virginia.[15]  Thus, not only would it not make sense for Rudolph to encourage defendants to lie on

their application, it would not make sense for Rudolph to suggest that defendants use the

Arlington, Virginia address *instead of* the Sacramento, California address, because the trial

evidence demonstrated that Rudolph did not know that Kalugin was then living in California and

not living in Virginia.  As the Supreme Court has held, if the jury disbelieved defendants, "it was

further entitled to consider whatever it concluded to be perjured testimony as affirmative

evidence of guilt."  *Wright v. West*, 505 U.S. 277, 296 (1992).  Again, taking the evidence in the

light most favorable to the government, a reasonable jury could find that defendants deliberately

and knowingly misrepresented Kalugin's current physical address on the Form N-400.

   Defendants also argue that defendants' misrepresentation about Kalugin's address was

not material.  As the parties agree, the government was required to prove that defendants' alleged

misrepresentations were "materially false."  Govt. Proposed Jury Instructions (Dkt. 144)

---

[15] In government exhibit 14E, Gallagher falsely represented to Rudolph on August 11, 2016 – days before the Form N-400 was submitted – that Kalugin was going to be visiting California but would be returning to the "DC area" after one month. Govt. Exh. 14E.  In reality, Kalugin had been living in California for months.  *See* Sept. 8 Trial Tr. at 125: 1-4.  Moreover, government exhibit 14E, demonstrates that Gallagher knew of the effect of defendants' deceit, because Gallagher was asking for Kalugin's biometric appointment to be moved to Sacramento (where Kalugin lived) but that Kalugin's interview be in the Washington, D.C. area because she perceived USCIS officers in D.C. to be more familiar with the expeditious naturalization process.  As shown in government exhibit 14H, in November 2016, Gallagher was still representing to Rudolph (falsely) that Kalugin was in Virginia and that it was only, after Gallagher was moving to post, that Kalugin would move to California.  *See* Govt. Exh. 14H at 3 (indicating that Kalugin will be moving to California when Gallagher departs for Mexico in December and expressing concern that the naturalization application would be transferred to California); Sept. 8 Trial Tr. at 128:16-23 (Gallagher conceding that she lied to Rudolph to make defendants look better).

(discussing materially false representations).  The Supreme Court has explained that in the

context of a § 1425 prosecution the false statements must have "sufficiently altered those

processes as to have influenced an award of citizenship."  *Maslenjak v. United States*, 137 S.Ct.

1918, 1928 (2016).  The government can meet the *Maslenjak* standard two ways: (i) if "the thing

[he] misrepresented when seeking citizenship . . . were itself a reason to deny naturalization –

say, because it counted as 'false testimony for the purpose of obtaining [immigration]" or (ii) if

the "misrepresented fact was sufficiently relevant to one or another naturalization criterion that it

would have prompted reasonable officials, 'seeking only evidence concerning citizenship

qualifications,' to undertake further investigation."  *Maslenjak*, 137 S.Ct. at 1929-31.

 Both the government and defendant rely on testimony from Officer Wood, the decision-

maker on Kalugin's naturalization application, to support their position on materiality.  In

relevant part, Officer Wood's testimony is as follows:

> Q. What if you knew the applicant answered this question [regarding his current
> address] falsely?  Would that impact your decision making?
>
> A. At the time, I don't think so.
>
> Q. Would it matter to you –
>
> Court If you knew it was false at the time, would it impact your decision making?
>
> A. It wouldn't impact my decision making at the time if he told me he was living
> in Virginia or told me he was living in Georgia, based on the review of the
> application and the orders.  I don't know if I . . .
>
> Court So even if you knew this answer was false, it wouldn't make any difference
> to you?
>
> A. For 319(b) [expeditious naturalization], it will make a difference if I knew
> that they're both living here in the United States.  Yes, it would make a
> difference.  But at the time of the application, if the spouse is overseas or
> working with the Department of State or whichever other company,
> sometimes they're not together. So at this time, based on the review of the
> orders, I can see that they were not living together.

Court   But suppose the answer you knew – suppose you knew the answer was false. Would that make any difference to your decision making?

A.   If he didn't change it, yes.

Court   And tell me why.

A.   Because when he signed this at the end of the application, he's telling that everything in the application is true and correct.  And if he didn't change that and I find out that he didn't make the changes necessary, then to me it will make a big difference, because then it's like, what else he didn't tell me. . . .

Sept. 3 Trial Tr. at 45:7-46:11.

Defendants focus on Officer Wood's testimony that "at the time" of the interview it would not have impacted Officer Wood's decision to know that Kalugin was "living in Virginia or told me he was living in Georgia."  Sept. 3 Trial Tr. at 44:13-16.  Officer Wood's testimony in this regard is unsurprising, given that Kalugin's naturalization was based on Gallagher's post position abroad.  It would be expected that while Kalugin awaited naturalization he would not be living with Gallagher who was abroad at her post in Matamoros, Mexico.  And consistent with Officer Wood's expectations, defendants waited to submit a change of address form until December 2016, after Gallagher received her orders to post in Mexico.[16]

But the government charged defendants with misrepresenting that they were living

---

[16] Defendants criticize Officer Wood for not asking any follow-up questions at the February 2018 interview regarding defendants' response regarding Kalugin's address at the February 2018 interview.  Defendants essentially argue that a material misrepresentation must be excused if it is not caught at the time of an immigration interview. The Fourth Circuit has rejected this argument, affirming a conviction where the USCIS officer did not ask a question about the specific statement on the Form N-400 alleged to be a misrepresentation. *See Garcia*, 855 F.3d at 620. Moreover, defendants' misrepresentation concealed the need to ask any follow up questions regarding Kalugin's address at the time the Form N-400 was submitted, because the record presented to Officer Wood demonstrated that defendants lived together in Arlington, Virginia (which was not true) until Gallagher received her orders to post, when defendants filed a change of address form for Kalugin.  The record before Officer Wood at that time falsely indicated that Kalugin moved to California only after Gallagher received her orders and proceeded to Matamoros, Mexico.  In fact, Kalugin had already been living in California for months prior to Gallagher receiving her orders to post.  Thus, Officer Wood *was* aware that Kalugin was living in California at the time of the interview in 2018, but defendants' submissions hid the fact that Kalugin had been in California since May 2016 – rather than December 2016 – and had been living separately from Gallagher while both were in the United States.

together in Arlington, Virginia *before* Gallagher moved to post and *while they both lived in the United States*. Defendants never corrected this false misrepresentation and, as Officer Wood testified, this was important information to have for an expeditious naturalization application. *See* Sept. 3 Trial Tr. at 45:19-23 ("It *will make a difference* if I knew that they're both living here in the United States. Yes, it would make a difference." (emphasis added)). Moreover, Officer Wood testified that it would matter to him if an applicant lied on the Form N-400 and never corrected it. *See id*. at 46:6-11 ("Because when he signs this at the end of the application, he's telling me everything in the application is true and correct. . . then to me it will make a big difference, because then it's like what else he didn't tell me."). Officer Wood further testified "every question here, if he answered falsely and he didn't tell me at the time, he wouldn't qualify," that a false response would indicate "not having a good moral character," and that, if Officer Wood were aware of a false response, "I would have further questions." *Id*. at 52:24-53:7. Thus, the evidence at trial was that it was material to the decision-maker whether Gallagher and Kalugin were living together at a time when they were married and both in the United States and that it mattered to the decision-maker that defendants falsely represented that they were living together in Arlington, Virginia. As Officer Wood testified, had he known of this false statement he would have asked further questions and the false statement would have reflected on Kalugin's moral character. This is sufficient evidence of materiality and satisfies *Maslenjak*, because defendants were concealing the fact that they were not living together and that fact would have led to further questions and investigation as to the status of their marriage, which was the sole basis for Kalugin's expeditious naturalization application. *See Maslenjak*,

137 S.Ct. at 1929-31.[17]

Accordingly, there is more than sufficient evidence of the falsity and the materiality of defendants' false representation that Kalugin's current physical address was Arlington, Virginia, after Kalugin had in fact moved to California, and a reasonable jury could therefore have found beyond a reasonable doubt that defendants are guilty of Count II.

### 3. False or Misleading Information to Government Officials Regarding Marital Status

Defendants also challenge the sufficiency of the evidence with respect to the final two statements alleged to be false in Count II of the Indictment: (i) defendants represented that Kalugin had never given any government official information that was false, fraudulent, or misleading, when in fact defendants misled USCIS regarding defendants' marital status; and (ii) defendants represented that Kalugin had never lied to any government official to gain admission or immigration benefits, when in fact defendants misled USCIS regarding defendants' marital status. The trial evidence was more than sufficient for a reasonable jury to conclude beyond a reasonable doubt that Gallagher and Kalugin repeatedly misrepresented that they lived together in Virginia in order to mislead government officials regarding the status of marriage, and thus, make their marriage and Kalugin's naturalization application, as Gallagher put it, "look better."

---

[17] As Gallagher testified, Gallagher was unsure whether she wanted Kalugin to join her at post, which would have impacted Kalugin's naturalization. *See* Sept. 8 Trial Tr. at 93:17 ("Because I was on the fence about him coming to post."). Moreover, the state of defendants' marriage when they were living together was questionable and indeed Gallagher viewed them as separated as of May 2016. *See id.* at 32:9-11 ('We were fighting a lot, and were fighting about household chores, we were fighting about the dogs. I felt like I wasn't being treated very well."); Govt. Exh. 8A (petition for divorce). If Officer Wood had known this information Kalugin would not have qualified for expedited naturalization, because "[i]f they are separated, they may still qualify for [some other naturalization] but not for 319b." Sept. 3 Trial Tr. at 90:1-14. Indeed, Gallagher revealed that she misled other employees at the Department of State regarding when Kalugin moved to California because she realized that "it made us look better" if Kalugin moved to California only after Gallagher received her orders to go to Mexico. Sept. 8 Trial Tr. at 128:10-23.

Sept. 8 Trial Tr. at 128:10-23.[18]

In both Kalugin's green card interview and the Form N-400, defendants represented that they lived together, when in fact they were living separately. As discussed above, on the Form N-400 Kalugin represented that he lived in Arlington, Virginia with Gallagher from April 2016 to December 2016, creating the false impression that the couple lived together in Virginia until Gallagher received her orders to post in Mexico. Defendants told the same lie in Kalugin's green card interview in July 2016. As Gallagher testified, in the green card interview the defendants represented that they "live[d] together as husband and wife." Sept. 8 Trial Tr. at 120:14-21. In fact, Kalugin had already moved to California at the time of that interview. Similarly, Gallagher misrepresented to Rudolph, the expeditious naturalization specialist, that Kalugin had only moved to California temporarily and that Kalugin would be residing with Gallagher's parents in California. Both statements were false. *See* Sept. 8 Trial Tr. at 128:10-21 ("He had been in California since May, but . . . we weren't planning for him to go stay with my parents."). And, as Gallagher testified, that was a misrepresentation made to make "us look better." *Id*. at 128:23.[19]

The jury could also reasonably infer from the evidence offered that defendants repeatedly concealed their physical separation from government officials as the Indictment alleges in order to mislead government officials about the state of their marriage and to obtain for Kalugin

---

[18] Gallagher's brief does not address these two alleged false statements that make up Count II, other than to note that they were "expressly predicated upon whether he misrepresented his residential address or marital status on the N-400 form." Gallagher Mot. at 17. Kalugin's brief does address the statements but only to argue that the charge failed because it "depended on proof he had in fact lied to government officials to gain immigration benefits." Kalugin Mot. for Acquittal at 10. As discussed *infra*, Kalugin did lie to government officials to gain immigration benefits.

[19] Importantly, Gallagher was not only Kalugin's spouse and an alleged co-conspirator, but also was Kalugin's representative in connection with his naturalization application.

expeditious naturalization. Kalugin's green card application and his expeditious naturalization were both based on his marriage to Gallagher. As Officer Wood testified, it would have made a difference to him in evaluating Kalugin's naturalization application to know that defendants were both living in the United States but that they were living apart at the time. *See* Sept. 3 Trial Tr. at 45:19-23; *id.* at 46:6-11. Thus, those misrepresentations were material. Additionally, courts have recognized that false responses on these questions are automatically disqualifying. *See United States v. Haroon*, 874 F.3d 479, 483 (6th Cir. 2017). In *Haroon*, the defendant falsely answered the same two questions regarding whether he had ever given false or misleading information to a government official or lied to gain admission to the United States. *Id.* The Sixth Circuit held that "[t]hese misrepresented facts automatically disqualified Haroon" because an applicant who gives "false testimony" for the purpose of obtaining an immigration benefit does not have "good moral character." *Id.*

Defendants misrepresented that Kalugin had not lied in connection with his immigration and naturalization applications for an immigration benefit. Thus, there is more than sufficient evidence for a reasonable jury to conclude beyond a reasonable doubt that defendants were guilty of Count II on the basis of those representations.

*     *     *

In summary, although the evidence is not sufficient to support a conviction on Count II on the basis that defendants falsely indicated that they were married on the Form N-400, the evidence is more than sufficient to support a conviction on Count II on the basis that defendants: (i) misrepresented Kalugin's current physical address; (ii) misrepresented that Kalugin had never given any government official information that was false, fraudulent, or misleading; and (iii) misrepresented that Kalugin had never lied to any government official to gain admission or

22

immigration benefits.  Accordingly, the motions for acquittal with respect to Count II must be denied.

## B.  COUNT III

Defendants next argue that there is insufficient evidence to support defendants' convictions on Count III.  Count III charges defendants with unlawful procurement of naturalization in connection with two statements made on the Record of Sworn Statement: (i) that defendants falsely represented that Kalugin had a good faith intention to reside abroad with Gallagher; and (ii) that defendants falsely represented that Kalugin had a good faith intention to reside with Gallagher in the United States upon her return from post.  Kalugin argues that an acquittal on Count III is necessary because, viewing the evidence in the light most favorable to the government, the evidence gives equal circumstantial support to a theory of guilt and a theory of innocence.  *See* Kalugin Mot. for Acquittal at 9.  Similarly, Gallagher argues that there was no evidence that Kalugin did not intend to join Gallagher at post.  *See* Gallagher Mot. at 24.

To begin with, Kalugin cites a case from the First Circuit holding that, where the evidence "gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence of the crime charged," the Court must grant a motion for acquittal.  *United States v. Morillo*, 158 F.3d 18, 22 (1st Cir. 1998).  Kalugin's reliance on this First Circuit case is not supported by Fourth Circuit precedent[20] or the evidence in this case.  As the Fourth Circuit has held, the question presented here is whether the verdict is supported by "substantial evidence," which is "evidence that a reasonable finder of fact could accept as adequate and sufficient to

---

[20] The only Fourth Circuit case to cite similar language appears to be *United States v. Christian*, 452 F. App'x 283 (4th Cir. 2011), which notes in a footnote that the defendant cited similar language from the Fifth Circuit.  *See id.* at 286 n.2.  The Fourth Circuit noted that the defendant misquoted the Fifth Circuit case and otherwise did not discuss or adopt the language.  *Id.*

support a conclusion of a defendant's guilt beyond a reasonable doubt." *United States v. Smith*, 451 F.3d 209, 216 (4th Cir. 2006).

The main thrust of defendants' argument in this regard relies on Kalugin's testimony that he intended to live with Gallagher abroad and when she returned to the United States and the fact that Kalugin did go to Mexico after becoming naturalized. By testifying, Kalugin and Gallagher put their credibility at issue and gave the jurors the opportunity to conclude that defendants were lying, and the verdict reflects that the jury so concluded. And, as noted previously, if the jury disbelieved defendants, the jury could take what it believed was perjured testimony as affirmative evidence of guilt. *See Wright*, 505 U.S. at 296. The jury may reasonably have disbelieved Kalugin's testimony regarding his intent to join Gallagher at post,[21] especially given Gallagher's admissions that she was, at best, "ambivalent" about Kalugin joining her in Mexico. Gallagher Mot. at 24.[22]

The government points to multiple other pieces of evidence on which the jury could have relied to support the verdict. As several witnesses testified, for expeditious naturalization, Kalugin was required to join Gallagher at post in Matamoros within forty-five days. First, Kalugin waited until the last possible day within the 45-day window to arrive in Matamoros. *See* Sept. 9 Trial Tr. at 52; Govt. Exh. 9A. The jury could thus reasonably infer that Kalugin was

---

[21] Interestingly, the first time Kalugin was asked why he went to Mexico his response was: "Oh, some of my stuff was already in Mexico because we packed our stuff when we were moving from Oxnard to Virginia; and when Laura was already stationed – posted and stationed in Mexico, all the stuff was shipped there." Sept. 8 Trial Tr. at 191:16-20. The jury may well have taken this testimony at face value and believed that the true reason Kalugin visited Gallagher in Mexico was to collect his belongings. Indeed, such an interpretation of Kalugin's testimony is further supported by the testimony that Kalugin spent less than a month in Mexico with Gallagher, part of which was spent on a vacation away from Gallagher's post at Matamoros and part of which Kalugin spent travelling back to the U.S. side of the border. *See* Govt. Exh. 9A; Sept. 8 Trial Tr. at 77:1-11.

[22] That a person selected to be a FSO representing the interests of the United States abroad would admit to being "ambivalent," at best, and opposed, at worst, to her spouse joining her abroad while supporting that spouse's expeditious naturalization which is contingent on such an event is deeply troubling.

hesitant to travel there.

Second, the border crossing records revealed that Kalugin only stayed in Matamoros for approximately three weeks in what Gallagher described to others as a "visit." Sept. 3 Trial Tr. at 112:7-19; Govt. Exh. 9A. Moreover, Gallagher testified that "for a lot of that time" defendants were not even in Matamoros but were visiting Chiapas in southern Mexico. Sept. 8 Trial Tr. at 77:1-11. Additionally, even when they were in Matamoros, Kalugin frequently left to make trips to the American side of the U.S.-Mexico border. *See* Govt. Exh. 9A. Thus, the jury could infer that Kalugin did not intend to reside in Matamoros but was merely visiting and stayed in Matamoros for as little time as possible.

Third, Tracey Leonard, the Community Liaison Officer ("CLO") at Matamoros, testified that there were certain requirements for spouses of FSOs to fulfill before arriving at post, including a foreign orientation program, and scheduled meetings to attend upon arrival at post, including meetings with the CLO and with other officers. Sept. 2 Trial Tr. at 158:11-23. Leonard testified that to her knowledge Kalugin did not fulfill those requirements and that Leonard was unaware of Kalugin's arrival until Gallagher introduced Kalugin to Leonard at Leonard's office. *Id*. at 162:1-164:2. Here again, the jury could infer from Leonard's testimony that Kalugin did not fulfill the requirements necessary to reside at post with Gallagher and that Kalugin appeared to be uninterested in making any kind of life with Gallagher there.

Fourth, written communications by Gallagher establish that Kalugin did not want to live abroad with Gallagher. *See* Govt. Exhs. 13C (message stating that Gallagher and Kalugin broke up because "[h]e wamts [sic] to stay in California for [the] rest of his life"), 15E ("[Kalugin] decided not go [to Matamoros] though."), 15G ("[Kalugin] . . . has realized that he does not want to spend much of his life abroad."), 15H ("Andrey and I ended up breaking up . . . because he

does not want a life of living overseas."). Indeed, Gallagher testified that Kalugin "wanted me to leave the Foreign Service." Sept. 8 Trial Tr. at 94:1-3. Furthermore, Gallagher and FSO Holly Pelas, who was stationed at post in Matamoros with Gallagher, testified that Kalugin arrived at post "because of the expeditious naturalization requirement." Sept. 2 Trial Tr. at 79:15-17 (FSO Pelas testimony); Sept. 8 Trial Tr. at 61:14-24 (Gallagher testifying that "one of the reasons that he was coming to post was it was one of the conditions of his expedited naturalization" and that was "something that we wanted to comply with").[23] Thus, the jury could infer from this testimony that Kalugin had come to Matamoros merely to appear to comply with the 45-day expeditious naturalization requirement and that Kalugin never intended to reside at post with Gallagher.

Finally, evidence was also presented that, although Kalugin testified that he "relinquished his post" with Inter-Con, Kalugin did not quit his job and continued to receive paychecks before and after his trip to Matamoros. Sept. 8 Trial Tr. at 190:11-16; Govt. Exh. 12D-E. The jury could infer that Kalugin did not quit his job or transfer his security guard position to Matamoros, which was after all part of his explanation for seeking that job and being in California, because he never intended to remain at post with Gallagher. There is thus substantial evidence on which the jury could rely to determine that Kalugin's statement that he intended in good faith to reside with Gallagher at post was false.

The jury could have relied on all the evidence discussed above to also support their verdict with respect to the alleged false statement that Kalugin intended to reside with Gallagher

---

[23] Other testimony from FSO Pelas, who was stationed with Gallagher in Matamoros, and FSO Kennedy, who was stationed with Gallagher in the Dominican Republic, provided further support for a reasonable jury to conclude that Kalugin did not intend to live abroad with Gallagher. *See* Sept. 2 Trial Tr. 62:22-24 ("[T]hey were continuing his citizenship process in some agreement prior to obtaining a divorce."); *id.* at 133:13-16 ("I said, what's happening with your husband? Are you divorced yet? [Gallagher] said no. And I said are you staying married so that he can get his citizenship? And she said yes.").

in the United States when she left post.  Again, Kalugin testified with respect to this statement in

the Record of Sworn Statement and, because he testified, the jury could, and apparently did

disbelieve him.  *See United States v. Brown*, 53 F.3d 312, 314 (11th Cir. 1995) ("Most important,

a statement by a defendant, if disbelieved by the jury, may be considered as *substantive evidence*

of the defendant's guilt." (emphasis in original)).  The jury could also have relied on the

testimony that defendants did not live together for the months prior to Gallagher's move to post,

that defendants attempted to conceal that fact, and that, as Gallagher testified, defendants "didn't

live together for any significant length of time."  Sept. 8 Trial Tr. at 141:16-17.  The jury could

also rely on Gallagher's testimony that, when defendants did live together, defendants were

"fighting a lot" and that Gallagher "felt like I wasn't being treated very well" to support the

conclusion that defendants did not intend to reside together in the United States when Gallagher

left post.  *See* Sept. 8 Trial Tr. at 32:9-14.  Accordingly, there is also substantial evidence on

which the jury could conclude beyond a reasonable doubt that Kalugin's statement that he

intended in good faith to reside with Gallagher after she returned to the United States was false.[24]

There can be no doubt that each of these representations was material.  Multiple

witnesses testified that to qualify for expeditious naturalization the applicant had to intend to

reside at post with the citizen spouse and reside with the citizen spouse in the United States after

the citizen spouse left post.  As Officer Wood testified, false answers to these questions would

disqualify an applicant from the expeditious naturalization process.  *See* Sept. 3 Trial Tr. at

---

[24] Defendants could also fairly point out that they presented evidence that they investigated purchasing a home together in California.  However, the testimony from real estate agent Judah Kent also establishes that: (i) they never purchased a home, Sept. 9 Trial Tr. at 110:14-20; (ii) Gallagher alone was originally going to be the party entering a purchase agreement on any potential home, *id.* at 105:8-10; and (iii) Gallagher could not meet the residency requirement for a loan without Kalugin, who was living separately from her in California, *id.* at 115:14-19.  Thus, the jury could reasonably infer that defendants investigated buying a home together as a matter of convenience for Gallagher who could not alone meet the residency requirement for a loan and ultimately never purchased any home together because they did not desire to do so.

60:23-61:3 ("They're not using the 319(b) expedite [sic] naturalization as a – just to gain

citizenship and not live with the spouse.  They have to live with the spouse.").  Moreover, if

Kalugin had responded "no" to either question he would no longer qualify for expeditious

naturalization.  *Id*. at 62:1-12.  Additionally, a false response to either question also reflects on

Kalugin's "good moral character" and would have disqualified him from citizenship.  *Id*. at

60:13-15.  As the Supreme Court held in *Maslenjak*, "[i]f the facts the defendant misrepresented

are themselves disqualifying, the jury can make quick work of that [materiality] inquiry."

*Maslenjak*, 137 S. Ct. at 1928.

　　In sum, viewing the evidence in the light most favorable to the government, there is

substantial evidence to support the jury's verdict on Count III.  Accordingly, defendants'

motions for acquittal with respect to Count III must be denied.

### C. COUNT I

　　Defendants next challenge their conviction on Count I, which alleged a conspiracy.[25]  As

the parties agree, to establish a conspiracy the government must demonstrate: "(1) the existence

of an agreement; (2) an overt act by one of the conspirators in furtherance of the objectives; and

(3) an intent on the part of the coconspirators to agree, as well as to defraud the United States."

*United States v. Tedder*, 801 F.2d 1437, 1446 (4th Cir. 1986).  "Section 371 comprehends not

only conspiracies intended to involve the loss of government funds but also 'any conspiracy for

the purpose of impairing, obstructing, or defeating the lawful function of any department of

government." *Id*. at 1437.  To prove conspiracy to violate another law, including naturalization

---

[25] Gallagher's brief devotes very little analysis to Count I, only asserting in conclusory fashion that there was no evidence that Kalugin understood the Form N-400 to be false. But, as discussed *supra*, there was ample evidence from which a reasonable jury could have determined beyond a reasonable doubt that defendants made knowingly false statements on the Form N-400.

fraud, the government must show "an agreement to commit an offense, willing participation by the defendant, and an overt act in furtherance of the conspiracy." *United States v. McNeal*, 818 F.3d 141, 149 (4th Cir. 2016). Here, the government alleged that the purpose of the conspiracy "was to obtain naturalization and citizenship and proof of U.S. citizenship by making false statements and submitting fraudulent documents." Indictment at 10.

Defendants first argue that there was insufficient evidence that Kalugin knowingly and voluntarily agreed with Gallagher to violate the law. Not so. The evidence at trial established that Kalugin falsely represented that his current physical address in August 2016 was in Arlington, Virginia and that Kalugin had lived there since April 2016. In fact, Kalugin had moved to California in May of 2016. Kalugin knew this to be false because in May 2016 he had renewed his California driver's license, was renting a place to live in California, and had his bank account list an address in California. Furthermore, the evidence presented at trial demonstrated that Gallagher, who entered an appearance to represent Kalugin in connection with his Form N-400, completed the Form N-400 on Kalugin's behalf. The Form N-400 containing this false statement was then emailed to Kalugin for Kalugin to review. *See* Sept. 8 Trial Tr. at 54:22-55:2; Govt. Exh. 15J. As Kalugin testified at trial, Kalugin agreed to use the false Arlington address on the Form N-400. *See* Sept. 8 Trial Tr. at 181:12-19; Sept. 9 Trial Tr. at 61:8-12. Gallagher completed the Form N-400 and Kalugin then signed the form and attested that the answers were truthful in the interview, despite the use of the false Arlington address. Gallagher also purchased flights so that Kalugin could travel from California to Virginia for his immigration interviews. Thus, there was sufficient evidence to demonstrate an agreement to misrepresent Kalugin's address so that it would appear that Gallagher and Kalugin were living

together in Virginia.[26]

Additionally, Gallagher's statements to other individuals reveal defendants' intent to mislead government officials and unlawfully procure naturalization for Kalugin. Importantly, when explaining why she helped Kalugin apply for naturalization, Gallagher did not testify regarding any desire to live with Kalugin at post or in the future. Rather, after explaining the many difficulties in their relationship, Gallagher explained that she helped Kalugin with his naturalization because "it was important to him." Sept. 8 Trial Tr. at 62:7-12. Indeed, U.S. citizenship was so important to Kalugin that Gallagher discussed it with her boyfriend, Diego Sanchez Almanzar, who recalled that Gallagher had "a boyfriend from Russia and he liked the United States." Sept. 2 Trial Tr. at 151:4-6.

There was also testimony that defendants agreed to postpone divorcing, which would have disqualified Kalugin from expeditious naturalization, until Kalugin had obtained citizenship. FSO Pelas, who was stationed at Matamoros with Gallagher, provided further information on defendants' agreement to obtain citizenship for Kalugin before divorcing, as indeed came to pass: "[T]hey were continuing his citizenship process in some agreement prior to obtaining a divorce." Sept. 2 Trial Tr. 62:22-24.[27] FSO Pelas also testified that Kalugin had threatened to make the divorce more difficult for Gallagher if she did not submit certain paperwork by a given deadline. *Id.* at 68:19-69:1 ("[S]he indicated that he had told her that he

---

[26] Kalugin argues that, even if there was sufficient evidence that Gallagher intended to mislead the United States, there is no evidence of Kalugin's specific intent. But, as discussed above, Kalugin knew that he did not live at the Arlington address yet agreed with Gallagher to use that address on the Form N-400. Thus, this is not the case of an innocent spouse, as Kalugin attempts to argue. *See* Kalugin Mot. for Acquittal at 17-18.

[27] FSO Pelas repeated that statement at several points during her testimony. *See* Sept. 2 Trial Tr. at 83:1-2 ("[Gallagher] told me that they had agreed to finish his naturalization" before divorcing); *id.* at 83:10-12 ("But [Gallagher] indicated that they had agreed to continue the naturalization process, and that they were going to continue that" before divorcing)

would make it more difficult for her after that time."). This discussion so concerned FSO Pelas that she submitted a written complaint regarding "whether or not the marriage and the naturalization were proper" and "the threat to national security that it provides when someone has a situation in which they could be blackmailed." *Id*. at 69:15-20. Others echoed FSO Pelas testimony. FSO Jennifer Kennedy also testified that there was an agreement between Gallagher and Kalugin. *See Id*. at 133:13-16 ("I said, what's happening with your husband? Are you divorced yet? [Gallagher] said no. And I said are you staying married so that he can get his citizenship? And she said yes."). Sanchez Almanzar also expressed his hope that Kalugin would be "cool" and "not becoming a jerk" forcing Gallagher to "pay for that transportation and stuff"[28] after "the paperwork was done." *Id*. at 151:19-152:2.

Kalugin argues, in his reply, that the government cannot rely on these out-of-court statements by Gallagher to third parties. But, of course, Rule 801(d)(2)(E), Fed. R. Evid., provides that a statement made by a co-conspirator in furtherance of a conspiracy is not inadmissible hearsay.[29] Kalugin focuses his argument on whether defendants were "married" or "separated," arguing that "the government relies exclusively on out-of-court statements made by Ms. Gallagher, introduced through third-party witnesses, that the couple was 'broken up.'"

---

[28] Gallagher paid for Kalugin's flights from California to Virginia for his two immigration interviews.

[29] Kalugin neither objected to the admission of such statements against him during trial nor requested a limiting instruction regarding FSO Pelas' and FSO Kennedy's testimony about what Gallagher told them during trial. Nor does Kalugin object to the admissibility of FSO Pelas' and FSO Kennedy's statements against him in his brief on his motion for judgment of acquittal. Thus, any objection to the admissibility of such statements is waived. *See* Fed.R.Evid. 103(a); *DiPaola v. Riddle*, 581 F.2d 1111, 1113 (4th Cir.1978). Indeed, the first time that Kalugin raises any issue about the testimony by FSOs Pelas and Kennedy is in his Reply brief – to which the government was unable to respond – and the only argument identified in the Reply brief focused on how the government relied on that testimony and the weight of the evidence of a conspiracy – not the admissibility of FSO Pelas' and FSO Kennedy's testimony. Kalugin goes on to concede that FSO Pelas' and FSO Kennedy's testimony could be admissible against him "on the basis of the statutory co-conspirator carveout under 801(d)(2)(E). *See* Kalugin Reply at 5, n.2. Although Kalugin criticizes the admissibility of co-conspirator statements generally, he does not dispute that Gallagher's statements to FSOs Pelas and Kennedy were admissible against him as co-conspirator statements.

Kalugin Reply at 4.  But Count I alleges a conspiracy that goes beyond the alleged

misrepresentation of marital status (which as discussed *supra* was the literal truth, but

misleading).  Instead, Count I alleges a broad conspiracy "to obtain naturalization and citizenship

and proof of U.S. citizenship by making false statements and submitting fraudulent documents,"

which includes the false statement regarding Kalugin's address, and specifically asserts that

defendants did so by submitting a signed Form N-400 containing false, fraudulent, and

misleading information.  Indictment at 10-11.  Moreover, the evidence in the record goes far

beyond the statements by FSO Pelas, FSO Kennedy, and Sanchez Almanzar.  As discussed

previously, Kalugin testified that he agreed to use the false Arlington address and the evidence

produced at trial demonstrated that the address was false and that Kalugin knew it to be false

because Kalugin did not live in Arlington in August 2016.  The testimony by FSO Pelas, FSO

Kennedy, and Sanchez Almanzar provides information regarding defendants' possible motives,

but does not constitute the only evidence of a conspiracy between Gallagher and Kalugin.

There is substantial evidence to support the jury's verdict that defendants engaged in a

conspiracy to obtain citizenship for Kalugin by submitting false documents and making false

statements to government officials.  Accordingly, defendants' motions for acquittal must be

denied with respect to Count III.

*    *    *

In summary, there is substantial evidence to support the jury's verdict on each count of

the Indictment.  The evidence in the record established that defendants conspired to obtain

expedited naturalization for Kalugin, as alleged in Count I, and made misrepresentations to

government officials in order to obtain immigration benefits, as alleged in Count III. Although it

may be literally true that defendants were married at the time of the submission of the Form N-

32

400, the government relied on three other false statements that were all supported by ample evidence to sustain defendants' convictions on Count II.  Accordingly, defendants' motions for acquittal must be denied.

## IV.

Defendants moved for a new trial pursuant to Rule 33, Fed. R. Crim. P.[30]  Defendants argue that the Court improperly excluded messages between Gallagher and Kalugin that demonstrated Kalugin's then-existing state of mind and that Gallagher did not communicate to Kalugin that their marriage was over.  Defendants argue that these messages were "central to Mr. Kalugin's defense that he did not believe his marriage was over."  Kalugin Mot. for New Trial at 18.  The government argues that the messages were excluded properly and that they were inadmissible hearsay.

Rule 33 provides that, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  In this respect, the Fourth Circuit has instructed that "[a] trial court should exercise its discretion to award a new trial sparingly."  *United States v. Williams*, 2019 WL 3226483, at *3 (4th Cir. 2019).  A new trial should be granted where "it is demonstrated that the fundamental fairness or integrity of the trial result is substantially in doubt."  *United States v. Jennings*, 438 F. Supp. 2d 637, 642 (E.D. Va. 2006) (citing 3 Charles A. Wright, Nancy J. King, Susan R. Klein & Sarah N. Welling, Federal Practice and Procedure §§ 553–556).

Kalugin's argument focuses on proposed Defense Exhibit 30, which is a collection of

---

[30] In her motion, Gallagher moves for a new trial based on the same arguments made in support of her motion for acquittal.  For all the same reasons discussed above, Gallagher's motion for a new trial must be denied because the evidence supports defendants' convictions on each count.  Accordingly, the analysis here will focus on Kalugin's motion for a new trial which rests on the separate argument that relevant evidence was excluded improperly.

Facebook messages between Gallagher and Kalugin from May 15, 2016 to June 10, 2016.  *See* Def. Exh. 30.  The messages contain mutually affectionate references such as: "babe," "angel," "Queen," "honey," "I love you," and "snuggly wiggly woo."  Def. Exh. 30.

To begin with, given the ruling that defendants' statement that they were married was not false, defendants' argument regarding Defense Exhibit 30 appears to be moot.  Defendants argue that the messages are relevant to Kalugin's alleged belief that his marriage was intact in May 2016 and thus support Kalugin's argument that he did not falsely select "married" on the Form N-400.  But, as discussed *supra*, the Court has ruled that the selection of "married" was not false and cannot support the conviction on Count II.  Thus, Kalugin's belief that they were not "separated," as that term was used in the Form N-400, is not relevant because that alleged false statement does not support the conviction, and the motion must be denied as moot.

Even assuming *arguendo* that the motion is not moot, the motion must be denied.  The Facebook messages were hearsay because they were offered to prove the truth of the matter asserted, that at the time the defendants were sending messages saying "I love you" they were in love.  To begin with, courts have recognized that similar statements can constitute hearsay where they are admitted to prove the existence of a relationship.  *See United States v. Nuss*, 837 F. App'x 451, 454 (9th Cir. 2020) (recognizing that a text message saying "Morning sweetheart" would be hearsay if used to prove that co-conspirators were "sweethearts").  Defendants cites the case of *Lyons Partnership, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789 (4th Cir. 2001) to support their argument that the Facebook messages are not hearsay.  In *Lyons*, a trademark infringement suit, children exclaimed "Barney, Barney, Barney!" when they viewed a dinosaur suit that was not the trademarked Barney character.  The Fourth Circuit held that such statements were admissible because they tended to show that the children believed that the costume was

34

Barney, not that the costume was the trademarked character. Here, where defendants sought to introduce both sides of a conversation containing statements of affection, defendants go beyond trying to show what Kalugin believed. First, the nine pages of statements offered cover several weeks and include many statements that cannot have any relevance to what Kalugin believed about his relationship. The messages include statements about what both parties are doing, messages about finances, and messages alluding to a fight between the defendants. Second, the messages do not demonstrate that Kalugin had any beliefs about the strength or status of his marriage. Rather, the messages are intended to convey that Kalugin loved Gallagher, *i.e.* that when Kalugin says "I love you," he truly loved Gallagher. That impermissible purpose renders the statements hearsay which must be excluded unless an exception to the hearsay rule applies

Defendants also argue that the messages are evidence of Kalugin's state of mind (even though defendants sought to introduce both defendants' messages). Defendants argue that Gallagher's messages to Kalugin demonstrate that Kalugin believed that Gallagher loved him and that their relationship was intact. As the Fourth Circuit has noted, the threshold requirements for invoking this hearsay exception are that: (1) the statement must be contemporaneous with the mental state sought to be proven; (2) there must be no suspicious circumstances suggesting a motive for the declarant to fabricate or misrepresent his thoughts; and (3) the declarant's state of mind must be relevant to an issue in the case. *See United States v. Srivastava*, 411 F. App'x 671, 683 (4th Cir. 2011). On the question of relevance, "the declarant's statement of mind must be relevant to some issue in the case before such testimony can be admitted under Rule 803(3)." *Id.* (quoting *United States v. Veltmann,* 6 F.3d 1483 (11th Cir.1993)). Finally, "[w]here state of mind itself is in issue [as intent was in this case], the court must determine if the declarant's state of mind *at the time of the declaration* is relevant to the

declarant's state of mind *at the time at issue.*" *Id*. (emphasis in original) (quoting *United States v. Ponticelli,* 622 F.2d 985, 991 (9th Cir.1980)).

Here, defendants cannot establish that there was no motive for Kalugin to fabricate or misrepresent his thoughts nor can defendants establish that Kalugin's state of mind at the time of the declaration was relevant to Kalugin's state of mind at the time at issue. Defendants suggest that the fact that these are private marital communications means that defendants could have no incentive to lie. Not so. Kalugin had two motives to fabricate or misrepresent his thoughts: (1) his marriage to Gallagher was the basis of his green card application and his naturalization application;[31] and (2) throughout the messages Gallagher is sending money to Kalugin. Thus, Kalugin had substantial motive to conceal or mispresent his thoughts to Gallagher. Moreover, Kalugin's state of mind in May is not relevant to Kalugin's state of mind in August. As the Fourth Circuit held in *Srivastava*, the district court properly excluded statements as failing Rule 803(3)'s relevancy prong because "Srivastava's statement to Aggarwal preceded the largest transfers to India and the filing of the 1998 tax return by months." 411 F. App'x at 684. Similarly, here, Kalugin's Facebook messages to Gallagher in May 2016 precede his statements in the Form N-400 by months. Accordingly, the statements contained within Defendant Exhibit 30 do not fall within the Rule 803(3) hearsay exception and were excluded properly.

Although the Court did not refer to Rule 403, Fed. R. Evid., explicitly when ruling on the admissibility of Defense Exhibit 30, the Court also noted: "[T]hey're being offered to show that Gallagher loved Kalugin, that they were in a relationship, and to the extent that Kalugin intends to show them only to show the effect on him, that would be confusing and inappropriate." Sept.

---

[31] Indeed, the testimony from FSO Pelas, FSO Kennedy, and Sanchez Almanzar suggests that Kalugin valued obtaining American citizenship so much that he told Gallagher he would make life difficult for her if she did not assist him in naturalizing before they divorced.

8 Trial Tr. at 160:4-9.  Defendants argue that this cannot be construed as a ruling on Rule 403 and that it would be inappropriate to make a Rule 403 finding now.  But the Court's ruling clearly evokes the language of Rule 403, that is whether there is a danger of "unfair prejudice, confusing the issues, misleading the jury . . ."  Rule 403, Fed. R. Evid.  Moreover, in a Rule 33 motion, defendants must establish that there was a legal error that impacts the "fundamental fairness" of the trial.  *Jennings*, 438 F. Supp. 2d at 642.  It cannot be that, if evidence was improperly excluded as hearsay (which it was not), there is a fundamental fairness problem where the evidence could properly be excluded under Rule 403.[32]  Accordingly, it is appropriate to address whether Defendant Exhibit 30 could also be excluded properly under Rule 403.

Defendant Exhibit 30 was also excluded properly under Rule 403.  The Facebook messages are of limited relevance where they occurred months before the Form N-400 was filed.  Moreover, many of the statements contained within Defendant Exhibit 30 are not relevant at all.  *See* Def. Exh. 30 ("Can you send me a photo of your health insurance card").  On the other hand, statements of affection – *i.e.* "I love you" – could be accepted by the jury as truth: that Gallagher and Kalugin were in a relationship and loved each other.  Because there was limited probative value to these statements – made months before the Form N-400 was signed (and years before the February 2018 interview), the probative value is outweighed by the risk of jury confusion that they may accept these statements for the truth or that these statements demonstrate that defendants had the same feelings or intent months later.

Finally, even assuming *arguendo* that Defendant Exhibit 30 should have been admitted,

---

[32] *See United States v. Muhammad*, 64 F. App'x 629, 630 (9th Cir. 2003) (holding that, even the district court erred in concluding 911 tape was hearsay, evidence was appropriately excluded under Rule 403); *Renfro Hosiery Mills Co. v. Nat'l Cash Register Co.*, 552 F.2d 1061, 1070 (4th Cir. 1977) (finding that, even if there was an error in excluding evidence as hearsay, the error was harmless where evidence was properly excludable as incompetent or remote).

the exclusion was harmless error.  In analyzing whether a jury's verdict was influenced by an alleged error, a district court must consider three factors: (1) the centrality of the issue affected by the error; (2) the steps taken to mitigate the effects of the error; and (3) the closeness of the case. As defendants repeatedly assert, the Facebook messages were "central to Mr. Kalugin's defense that he did not believe his marriage was over."  Kalugin Mot. for New Trial at 18.  As the Court has now ruled, however, the statement that defendants were married cannot support defendants' convictions.  Thus, evidence pertaining to whether defendants viewed themselves as "separated" or "married" is not relevant to any remaining false statement supporting their convictions.  Moreover, even if Defendant Exhibit 30 did provide some support to the truthfulness of other statements, the conversations in that exhibit took place months before the Form N-400 was submitted and years before the February 2018 interview and the signing of the Record of Sworn Statement. *See Srivastava*, 411 F. App'x at 684. The first factor, therefore, weighs in favor of harmless error.

Additionally, as the government points out, defendants testified as to their pet names for each other. *See* Sept. 9 Trial Tr. at 15-17 (Kalugin testifying to pet names such as "Mama," "Papa," "my beautiful one," "adorable," and "baby"); Sept. 8 Trial Tr. at 27-28 (Gallagher testifying to pet names such as "Andruska," "Larusha," and "Larechka").  Defendants also testified regarding their views of their relationship in May 2016 and at other times.  Defendants then called other witnesses who testified regarding defendants' relationship.  Because these steps all mitigate any alleged error, the second factor also supports a finding of harmless error.

Finally, this is not a close case because the Facebook messages do not impact any of the *other* statements that defendants made on the Form N-400 and elsewhere that were false.  As noted *supra*, the Facebook messages took place months before the submission of the Form N-

400 and years before the February 2018 interview and signing of the Record of Sworn Statement.

Importantly, the 2016 Facebook messages have no relevance to: (i) the use of the false Arlington,

Virginia address in the Form N-400 that supports defendants' convictions on Counts I and II; or

(ii) the 2018 statements that Kalugin intended to reside abroad with Gallagher and intended to

reside with Gallagher within the United States after she left post that supports defendants'

convictions on Counts I and III.  Additionally, as the government points out the jury's

deliberations in this case did not reflect that the jury viewed this case as a close one.  Although

requests from the jury for additional copies of the Indictment and for a pad of paper for an easel

make clear that the jury took their responsibilities seriously,[33] the jurors asked no questions about

the instructions or evidence and deliberated for three hours on a three-count Indictment

following a seven-day trial with nineteen witnesses.  This is thus not a case like *Ibisevic* where

the jury deliberated for four hours on a single-issue case and requested an additional instruction

before rendering a verdict.  *See Ibisevic*, 675 F.3d at 354.  Accordingly, even if excluding

Defendant Exhibit 30 was an error (it was not), that error was harmless.

*     *     *

In sum, Defendant Exhibit 30 was hearsay that fit within no applicable hearsay exception.

The Facebook messages included in the exhibit also ran afoul of Rule 403.  Even if any error was

committed in excluding Defendant Exhibit 30, such an error was harmless because the exhibit

was not relevant to any of the other statements that supported defendants' convictions on Counts

II or III nor was it relevant to the conspiracy.  In any event, defendants testified to the substance

of the Facebook messages, including their pet names for each other, and the jury was entitled not

to believe that testimony. Accordingly, defendants' motion for a new trial on the basis of

---

[33] *See* Dkt. 200.

Defendant Exhibit 30 must be denied.

## V.

For the reasons set forth above, defendants' motions for judgment of acquittal and motions for a new trial must be denied.

An appropriate order will issue separately.

The Clerk is directed to provide a copy of this Memorandum Opinion to all counsel of record.

Alexandria, Virginia
February 10, 2022

/s/

T. S. Ellis, III
United States District Judge